Shannon M. BATES, Appellant,

v.

Richard C. TESAR, II, Appellee.

No. 08–01–00026–CV.

Court of Appeals of Texas,
El Paso.

June 6, 2002.

Lisa Gayle Garza, Brad M. Lamorgese, Dallas, for Appellant.

Jimmy Lynn Verner, Verner & Brumley, Dallas, for Appellee.

## OPINION

McCLURE, Justice.

In this modification suit, we are called upon to determine whether relocation in and of itself constitutes a material and substantial change in circumstances as well as to consider the constitutional and statutory parameters of domicile restriction. Because Appellant also challenges the legal and factual sufficiency of the evidence to support the trial court's judgment, we provide a detailed factual recitation.

### FACTUAL SUMMARY

Shannon M. Bates and Richard C. Tesar, II were divorced July 12, 1996, in Dallas County. Pursuant to the decree of divorce, Shannon was appointed sole managing conservator and Richard was appointed possessory conservator of their two children, Ashley and Matthew. As sole managing conservator, Shannon had the exclusive right to establish the primary residence of the children without regard to geographic limitation. The decree included a standard possession order incorporating provisions in the event the parents

lived within 100 miles of each and provisions for long-distance access.

Shannon married James Bates in November 1998. On May 8, 1999, she mentioned to Richard that there was a possibility she might be moving to Port Lavaca.[1] On May 21, she notified Richard that she and the children would indeed be moving to Port Lavaca, probably sometime in July. She did not offer a specific date. By letter dated June 8, she provided "our new address" and "our new phone number" and mentioned that she had already enrolled the children in school. Shannon and Richard talked again on June 9 and during this conversation, Shannon announced a moving date of June 22. On Friday, June 11, Shannon advised that she would be moving on Monday, June 14, because James would be starting work in Port Lavaca that day. That same Friday, Richard obtained a temporary restraining order preventing Shannon from "changing the residence or current abode of the children." Shannon was served on June 14 when she met Richard and the children at the dentist's office following his weekend possession. She admittedly had her van loaded with items for the move, although she described them as "a few final things, but the truck was already in Port Lavaca."

Q: But you were still in the process of moving, weren't you?

A: There were things in my van, yes.

Q: And you went ahead and moved, and you didn't stay here, did you?

A: No, because I had already moved.

According to Shannon, the "move" occurred on June 9 and Matthew was in Port Lavaca with her, although Ashley was at church camp. She brought Matthew back to Dallas on June 11 for Richard's weekend. Thus, in her view, the temporary restraining order had no effect because she had already moved the children from Dallas to Port Lavaca and the order merely restrained her from changing their current residence. Richard testified that during one of the June conversations, he had asked Shannon if she thought moving the children to Port Lavaca was in their best interests. "[A]nd she said no, but that she thought that that was what was best for them at the time, for her and James."

Richard filed suit in June 1999, seeking joint managing conservatorship and a domicile restriction to prohibit Shannon from moving the residence of the children from Dallas County or its adjacent counties. At a temporary orders hearing on August 27, 1999, the associate judge entered a temporary injunction pending a final trial of the matter and ordered the children returned to Dallas County and enrolled in school by October 4, 1999. Shannon appealed the ruling to the trial court, which rescinded the associate judge's requirement that the children be moved back to Dallas pending trial.

Richard testified that prior to the move to Port Lavaca, he was involved in the children's school events and programs, Matthew's T-ball and soccer games, and a majority of Ashley's gymnastics meets.[2] He coached one of Matthew's soccer

---

1. Port Lavaca is on the Texas coast, some 362 miles from the Dallas suburb of Richardson, where Richard lives. He estimated the drive time at six and a half hours.

2. Ashley is apparently an outstanding gymnast with a dream of becoming an Olympic contender. Shannon explained that to qualify, Ashley must complete a series of levels which begin at Level 1 and proceed to Level 10. Ashley is currently on Level 7 and it has taken her less than four years to move up four levels, averaging one level per year. She expected to qualify for Level 8 within a year. After Level 10, she would proceed "to a lead gymnastics, which is where the girls are that go to the Olympics."

teams, refereed during another soccer season, and helped coach his second T-ball season. He was the vice president of Ashley's school booster club. He helped the children with their homework and took them to the library. Since the move, the children have had to miss school, are often tired during class, and spend many hours traveling between Port Lavaca and Dallas on flights, many of which they make without parental supervision. On occasion, the children fly out of Corpus Christi, which is 105 miles from Port Lavaca, or about a two hour drive. On other occasions they have departed from Houston or San Antonio. Houston is 140 miles from Port Lavaca and a two to two and a half hour drive. San Antonio is 170 miles away and roughly a three hour drive. When the children come for a weekend, they leave around noon and normally miss some school on Friday afternoon. Richard testified that the flights routinely run late, particularly when the children fly from Houston. Richard contends that it has been difficult for him to maintain a long-distance relationship with his children. Although most of Ashley's gymnastics meets had been in the Metroplex area while the children lived in Dallas, following the move to Port Lavaca, the majority of the meets were in the San Antonio area, with one in Houston. Between January and April 2000, there had been five gymnastics meets and Richard had attended four of them—one in Hurst, one in Austin, and two in San Antonio.

Prior to the move, Shannon and the children were living in Garland; the children were enrolled in private school in Carrollton and Ashley's gym was in Rowlett. Both children attended private school in Port Lavaca, although Ashley had expressed interest in attending public school. Ashley had two other students in her class;[3] Matthew had four in his. Ashley's gym was in Victoria, which is thirty miles from Port Lavaca. Her training sessions were after school five days a week. Richard acknowledged that Ashley had verbalized a desire to remain in Port Lavaca; Matt had not specifically said that he wanted to stay in Port Lavaca, but he liked it because of the beach. Richard did not believe that the move was in the children's best interest and thought their opinions had been "fed" to them to some extent.

Shannon described the events leading up to her decision to relocate. She had never before lived in Port Lavaca. The move was purely voluntary but predicated on financial reasons. It became too difficult to keep up with the cost of living.

It was putting a lot of stress—or it had been for years—to stay here in this area and have to go from one place to another to get everybody back and forth to all their activities, to hold a job and still get them to their activities without interfering and causing, you know, reason to be fired because you were taking off all the time.

Prior to the move, James was employed as a janitor at Covenant Church earning $30,000 a year. Shannon was also employed by the church as an administrative assistant to the pastor at an annual salary of $20,000. Both were laid off in May 1999. Shannon had received her GED but had no college credits; consequently she found it difficult to find employment in Dallas that would pay her more than minimum wage. At one point she testified that as far as she knew, it was also difficult for James to find employment; at another point she acknowledged that James had

---

**3.** Shannon explained that Ashley's school encompasses fifth grade through high school and there are a total of eleven or twelve students in the combined learning centers. There are two other students in Ashley's grade, but not in her class.

made no real effort in May or June of 1999 to find work in the Dallas area. She admitted that between December 1998 and March 1999, she and James had been looking for land in order to build a house. The financial issues were more important to her than Richard's relationship with the children if it sustained a "good home life for the children." At the time of trial, Shannon was pregnant and voluntarily unemployed because of the health of her two-year old. She had no intention of going back to work. The financial stresses had lifted and there was not as much of a financial burden. James expected to earn between $50,000 and $65,000 for the year 2000. The children were no longer in day care and they had time to play after school because the commuting time and distance were reduced. Ashley got home from the gym earlier and had less homework. They had more time together as a family.

Shannon characterized Richard as a non-involved parent who never really had a relationship with the children until he became upset with her over the move. In her view, he was controlling and inflexible. She discounted his involvement with Matthew's sporting activities.[4] She believed Richard had difficulty handling both children at the same time. Richard admitted to not exercising his Wednesday night possession while the children were in Dallas and that he was not able to attend all of the team practices even when he coached because he was at work. Although pursuant to the terms of the divorce decree, Richard was to have summer possession of the children for thirty days, he did not exercise his summer access in 1997 and 1998:

> During those two summers, I thought at the time it was in the best interest of the kids to maintain a normal schedule. Because Ashley had gymnastics during the middle of the week four days a week, I did not feel I'd be able to—to get her to—I thought that she would miss out on quite a bit of that, because if she had been—or the kids had been in my custody for the 30 straight days, I would have had to have put them in day care, and getting them back and forth would be difficult.

Shannon explained that when she did not hear from Richard in 1999 as to what his summer plans were, she called him. He told her that it was not convenient for him to have the children. Following a court hearing on June 24, Richard expressed interest in summer visitation for the first time. Pursuant to agreed temporary orders, the children spent six weeks with their father with his possession divided into two three-week periods between June 28 and August 8. Richard married his current wife, Amber, on August 17, 1999. The record does not reveal whether the children attended the wedding. Shannon believed that since the wedding, she had had more parental contact with Amber than with Richard.

Shannon's solution to the long-distance visitation was for the children to travel to Dallas once a month and for Richard to travel to Port Lavaca once a month. In response to questioning by the ad litem, however, she mentioned that the children enjoyed getting on an airplane every other week, that Matthew loved to fly, and that the children were no more tired than usual on Monday mornings. She opposed long periods of visitation during the summer and suggested that summers be broken up into three two-week periods. The children had had difficulty adjusting to the three-

---

4. Shannon testified, "I believe that the quality of time that you have with them and spend with them is more important than an hour at a baseball game on a Saturday shared with ten other children."

week periods during 1999 because they had not visited with their father for more than three consecutive nights. She did not believe it was fair and equitable that she should have to bear the transportation expenses for the children to travel to Dallas although she ultimately testified that she was asking the court to order Richard to pay only half the cost of the airline expenses. She could not remember whether she had told the guardian ad litem that she had no objections to a joint managing conservatorship, but she testified at trial that removing her as sole managing conservator would be detrimental to the children. She claimed that she had encouraged visitation between Richard and the children but that Richard did not take advantage of it. However, she offered the following testimony as well:

Q: Well, when the kids were with you, did you even have the kids call Richard on his birthday?

A: We weren't there when it was his birthday.

. . .

Q: But you're the one that made the decision to go to Port Lavaca?

A: Yes, I did.

Q: It wasn't a joint decision, was it?

A: Not with Richard. I didn't have to talk to him about that.

A social study was prepared in connection with the suit. The investigator, Cindy Pittman, commented that the children were more spontaneous, more affectionate and happier in their mother's home. They were polite and well-behaved around their father and Amber, but were more reserved; "they acted like they were at a stranger's house." Pittman recommended that Shannon and Richard share joint managing conservatorship with Shannon having the right of primary possession. She characterized Richard as a concerned parent who loved his children and wanted to be actively involved in their lives. She believed the children should remain in Port Lavaca because the quality of life was better, they had a network of family, there was a lot less travel time between school and activities, the gymnastics facility was better, and the private schools and gymnastics classes cost less than in Dallas. Moreover, the children had indicated to her that they wanted to stay in Port Lavaca and she did not believe they had been coached in their answers. Pittman acknowledged that limiting Richard's possession to one visit per month would impact the quality of the relationship he had with the children, but "since they haven't seen him all along, I don't think it's going to be a major factor." She believed uprooting the children a second time to move them back to Dallas would create a major impact on them because it would have a major impact on their mother and stepfather.

Neither James nor Amber testified at trial. It appears from the record, however, that the children have an attachment to both stepparents. Both had referred to James as "dad" which generated some conflict with Richard. Ashley stopped when Richard told her how much it hurt him. Despite urging by both Shannon and Richard, Matthew has continued the practice. Matthew also refers to Amber as "my mom in Dallas."

Following a hearing, the trial court granted Richard's motion to modify; appointed the parents joint managing conservators; and ordered Shannon to return the children to Dallas County, to establish the primary residence of the children within Dallas County,[5] and to register them for

---

5. While in his pleadings, Richard had sought a domicile restriction to Dallas and adjacent

school no later than August 14, 2000. Upon timely request, he entered specific findings of fact and conclusions of law. Pertinent to this appeal, he found:

- that Shannon failed to give Richard the statutory notice of the children's change of residence;

- that Richard and the children have a close and loving relationship;

- that Richard was substantially involved in the children's extracurricular activities, in addition to his standard scheduled visitation and that he is committed to being fully involved in their lives;

- that the children would be denied substantial involvement with their father in their extracurricular activities as a result of the move to Port Lavaca;

- that at this point in the children's lives, a move away from their father would be detrimental to the children;

- that there had been a material and substantial change of circumstances since the date of divorce;

- that the move to Port Lavaca was not in the best interest of the children; was detrimental to their welfare; and subjected them to the strain of relocation, frequent air travel (generally unaccompanied by an adult), loss of social and recreational opportunities with their father, loss of additional parenting times with their father, and the disruption of their routine at school and with their friends;

- that the move was not necessitated by an employment transfer nor was there a mandatory reason requiring the move;

- that the retention of the sole managing conservator would be detrimental to the welfare of the children;

- that the appointment of Shannon and Richard as joint managing conservators would be a positive improvement for the children and in their best interest; and the physical, psychological, and emotional needs and development of the children would benefit from appointing the parents as joint managing conservators;

- that it was in the best interest of, and a positive improvement for, the children to reside in Dallas County;

- that the economic considerations and other factors cited by Shannon in requesting that the children be allowed to remain in Port Lavaca were outweighed by the importance of the children having frequent and continuing contact with their father in Dallas County;

- that there would be no substantial hardship on Shannon in returning the children to reside in Dallas County;

- that it was in the best interest of the children that Richard be involved in their daily life and activities which was best accomplished by their residing in Dallas County; and

- that Dallas County is at the heart of a large metropolitan region which has experienced and continues to experience population growth which, in turn, has led to significant road and freeway congestion and delay; that this congestion and delay extends to counties contiguous to Dallas County; that this congestion and delay would likely operate to reduce the time Richard and the children could spend with each other and the amount of time Richard could spend attending school functions and extracurricular activities because of the time and travel involved if Richard and the children lived in different, but adjacent, counties;

counties, he testified without objection that he wanted the residence established in Dallas County.

In its conclusions of law, the court determined:

- that the domicile restriction did not violate Shannon's procedural or substantive due process rights under the Fourteenth Amendment to the United States Constitution;
- that the court's order did not retroactively interfere with the exercise of Shannon's prior court-ordered rights;
- that pursuant to Section 156.105 of the Texas Family Code, the power of the court to order joint managing conservatorship is a material and substantial change in circumstances justifying modification of an existing sole managing conservatorship rendered on or after September 1, 1987;
- that pursuant to Section 153.131(b) of the Texas Family Code, there is a rebuttable presumption that the appointment of the parents as joint managing conservators is in the best interest of a child and that Shannon did not rebut the presumption; and
- that the court's rights under Section 153.002 supersede the provisions under Section 153.134(b)(1)(a)—requiring the minor children to reside in Dallas County or any contiguous county—since it was in the best interest of the children to reside in Dallas County.

## ERRONEOUS APPLICATION OF PRESUMPTION

 It is clear from the conclusions of law we have referenced that the trial court applied the statutory presumption that joint managing conservatorship was in the best interest of the children and required Shannon to rebut this presumption in the modification proceeding. We must disagree. The presumption most certainly applies to a determination of conservatorship incident to divorce. However, once a conservatorship order has been implemented, the concept of *res judicata* attaches and the order establishes what was in the best interest of the children at the time of divorce. *Knowles v. Grimes,* 437 S.W.2d 816, 817 (Tex.1969); *In re C.Q.T.M.,* 25 S.W.3d 730 (Tex.App.—Waco 2000, pet. denied). This concept is recognized by the requirement that a party attempting to modify a prior order entered in a suit affecting the parent-child relationship must establish that there has been a material and substantial change in circumstances since the date of rendition of the prior order.

In considering the applicability of the parental presumption in a modification action, the Supreme Court has recognized the distinction between original suits affecting the parent-child relationship pursuant to Chapter 153 and modification proceedings brought under Chapter 156:

Chapter 153 and Chapter 156 are distinct statutory schemes that involve different issues. Chapter 156 modification suits raise additional policy concerns such as stability for the child and the need to prevent constant litigation in child custody cases. *See Taylor,* 276 S.W.2d at 790; *Watts v. Watts,* 563 S.W.2d 314, 316 (Tex.Civ.App.—Dallas 1978, writ ref'd n.r.e.). The Legislature has determined that the standard and burden of proof are different in original and modification suits. *Compare* TEX. FAM.CODE § 153.134 *with* TEX.FAM. CODE § 156.101. A natural parent has the benefit of the parental presumption in an original proceeding, and the non-parent seeking conservatorship has a higher burden. *See Brook,* 881 S.W.2d at 298; TEX.FAM.CODE § 153.131. However, the Legislature did not impose different burdens on parents and non-parents in modification suits. When we construe a statute, our primary objective is to give effect to the Legislature's in-

tent. *See Mitchell Energy Corp. v. Ashworth,* 943 S.W.2d 436, 438 (Tex.1997). Because the Legislature did not express its intent to apply the presumption in Chapter 156 modification suits, courts should not apply the presumption in those cases. *In re V.L.K.,* 24 S.W.3d 338, 343 (Tex. 2000). Similarly, we conclude that the presumption favoring joint managing conservatorship does not apply in modification proceedings.[6] We must now address the effect of the trial court's erroneous application of the presumption. Shannon contends that because the trial court applied the wrong standard, it committed reversible error.

A conclusion of law can be attacked on the ground that the trial court did not properly apply the law to the facts. *Foster v. Foster,* 884 S.W.2d 497 (Tex.App.— Dallas 1993, no writ). However, erroneous conclusions of law are not binding on the appellate court and if the controlling findings of fact will support a correct legal theory, are supported by the evidence, and are sufficient to support the judgment, then the adoption of erroneous legal conclusions will not mandate reversal. *Leon Ltd. v. Albuquerque Commons Partnership,* 862 S.W.2d 693 (Tex.App.—El Paso 1993, no writ); *Westech Engineering, Inc. v. Clearwater Constructors, Inc.,* 835 S.W.2d 190, 196 (Tex.App.—Austin 1992, no writ). "If an appellate court determines a conclusion of law is erroneous, but the judgment rendered was proper, the erroneous conclusion of law does not require reversal." *Town of Sunnyvale v. Mayhew,* 905 S.W.2d 234, 243 (Tex.App.— Dallas 1994), *rev'd on other grounds,* 964 S.W.2d 922 (Tex.1998). The standard of review for legal conclusions is whether they are correct. *Zieben v. Platt,* 786 S.W.2d 797, 801–02 (Tex.App.—Houston [14th Dist.] 1990, no writ). We review them *de novo* as a question of law. *State v. Evangelical Lutheran Good Samaritan Society,* 981 S.W.2d 509, 511 (Tex.App.— Austin 1998, no pet.); *Nelkin v. Panzer,* 833 S.W.2d 267, 268 (Tex.App.—Houston [1st Dist.] 1992, writ dism'd w.o.j.). In other words, we must independently evaluate conclusions of law to determine their correctness when they are attacked as a matter of law. *U.S. Postal Service v. Dallas County Appraisal District,* 857 S.W.2d 892, 895–96 (Tex.App.—Dallas 1993, writ dism'd). Consequently, we turn to the merits, but before we can address the standard of review to be applied, we must necessarily resolve the question of which parent bore the burden of proof.

## BURDEN OF PROOF

Our sister states have adopted differing schemes with regard to relocation litigation,[7] some by statutory presumption, some by judicial construction. A few have concluded that "it serves neither the interests of the children nor the ends of justice

---

**6.** In his concurring opinion in *Rayburn v. Rayburn,* 979 S.W.2d 858 (Tex.App.—Beaumont 1998, no pet.)(Stover, J., concurring), Justice Stover suggests that the effect of Section 156.105 is to make the "material and substantial change" prong an *automatic* finding in every motion to convert a sole managing conservatorship to a joint managing conservatorship if the existing order was rendered on or after September 1, 1987. He notes that such an interpretation would be consistent with the presumption that a joint managing conservatorship is in the best interest of the child. As we will discuss, Section 156.105 was repealed during the 2001 legislative session.

**7.** For an excellent discussion and analysis of relocation litigation, *see* Edwin J. (Ted) Terry, Jr., James A. Vaught, Karl E. Hays, and Jennifer L. Tull, *Dealing with Mobile Parents: Domicile Restrictions and Relocation,* 3 STATE BAR OF TEXAS ADVANCED FAMILY LAW COURSE 69 (2001).

to view relocation cases through the prisms of presumptions and threshold tests that artificially skew the analysis in favor of one outcome or another." *Tropea v. Tropea*, 87 N.Y.2d 727, 740, 665 N.E.2d 145, 151, 642 N.Y.S.2d 575, 581 (1996); *see also Jaramillo v. Jaramillo*, 113 N.M. 57, 59, 67, 823 P.2d 299, 301, 309 (N.M.1991)(refusing to create a presumption in favor of either the relocating parent or the resisting parent; party seeking modification has burden to demonstrate existing arrangement is no longer workable).

Other states require the custodial parent to obtain judicial approval prior to relocation, thus placing the burden of proof on the custodial parent to prove that the move is in the best interest of the child. *Stout v. Stout*, 560 N.W.2d 903, 913 (N.D. 1997); *In re Marriage of Smith*, 172 Ill.2d 312, 320, 216 Ill.Dec. 652, 655–56, 665 N.E.2d 1209, 1212–13 (1996); *Effinger v. Effinger*, 913 S.W.2d 909, 912 (Mo.App. E.D.1996); *Carter v. Schilb*, 877 S.W.2d 665, 667 (Mo.App. W.D.1994). Still others have adopted a presumptive right of the custodial parent to change the residence of a child so long as removal would not be detrimental to the child and thus have placed the burden of persuasion on the non-custodial parent in a modification pro-ceeding. *In re Marriage of Burgess*, 13 Cal.4th 25, 35, 37, 913 P.2d 473, 480, 482, 51 Cal.Rptr.2d 444, 451, 453 (1996).[8] Colorado has established a presumption in the custodial parent's favor which is triggered once the custodial parent presents a *prima facie* case demonstrating a sensible reason for the move; the burden then shifts to the non-custodial parent to establish that the move is not in the best interest of the child. *In re Marriage of Francis*, 919 P.2d 776, 784–85 (Colo.1996). The Minnesota Supreme Court has found an implicit statutory presumption that removal is permitted and requires the party opposing removal to present a *prima facie* case that relocation is not in the best interest of the child and would endanger the child's health and well-being. *Silbaugh v. Silbaugh*, 543 N.W.2d 639, 641 (Minn.1996); *Auge v. Auge*, 334 N.W.2d 393, 396–97 (Minn.1983). Washington places the burden on a non-residential parent who seeks a domicile restriction. *In re Marriage of Sheley*, 78 Wash.App. 494, 503, 895 P.2d 850, 856 (Wash.App.1995). Tennessee permits the custodial parent to remove the child from the jurisdiction unless the non-custodial parent can show that the motive for the relocation is intended to defeat visitation rights or the move evidences such bad judgment and is so potentially

---

8. As the *Jaramillo* court noted, there are two schools of thought on the relocation issue. One commentator has suggested that it is rarely in the child's best interest to change geographical locations following divorce, regardless of the fact that the primary conservator feels "more self-satisfied after the move." P. Raines, *Joint Custody and the Right to Travel: Legal and Psychological Implications*, 24 J.FAM.L. 625, 656 (1985–86). In her view, there should be a presumption that relocation will be contrary to the child's best interest and the relocating parent should bear the burden of proving that the move will be in the child's best interest. On the other end of the spectrum is Professor Judith S. Wallerstein, PhD, who believes that the courts should recognize a presumptive right of the custodial parent to move with the child and require the noncustodial parent to demonstrate that the move will be harmful to the child. *See* Judith S. Wallerstein and Tony J. Tanke, *To Move or Not to Move: Psychological and Legal Considerations in the Relocation of Children Following Divorce*, FAM.L.Q., Vol. 30 No. 2, Pg. 305, 314–15 (Summer 1996). Although Wallerstein appeared in *Burgess* as *amici curiae* on appeal rather than as a testifying expert at trial, the majority opinion adopted her viewpoint. *See In re Burgess*, 51 Cal.Rptr.2d 444, 913 P.2d at 482. In any event, the divergent views of these commentators permeate many of the relocation decisions.

harmful to the child that custody should be changed. *Aaby v. Strange,* 924 S.W.2d 623, 629 (Tenn.1996).

The Texas Family Code is silent on the subject. In the absence of legislatively imposed statutory presumptions in relocation cases, we conclude that Richard, as the moving party, was required to prove a change in circumstances.[9]

## MODIFICATION OF CONSERVATORSHIP

In her first point of error, Shannon complains that the trial court abused its discretion in replacing a sole managing conservatorship with a joint managing conservatorship. She contends that the only evidence of a material and substantial change in circumstances since the entry of the final decree of divorce was her relocation from Dallas to Port Lavaca. She also argues that there was no evidence, or alternatively, factually insufficient evidence, to support the modification. Where the abuse of discretion standard of review overlaps with a traditional evidentiary sufficiency review, as they frequently do in family law cases, we employ a hybrid analysis.

### *Standards of Review*

A trial court's order modifying conservatorship will not be disturbed on appeal unless the complaining party can show a clear abuse of discretion. *Gillespie v. Gillespie,* 644 S.W.2d 449, 451 (Tex.1982); *Jenkins v. Jenkins,* 16 S.W.3d 473, 477 (Tex.App.—El Paso 2000, no pet.). The test for abuse of discretion is whether the trial court acted in an arbitrary and unreasonable manner, or whether it acted without reference to any guiding principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 242 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). The mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate justice in a similar circumstance does not demonstrate that an abuse of discretion occurred. *Downer,* 701 S.W.2d at 241–42; *Jenkins,* 16 S.W.3d at 477. The question of conservatorship of a child is addressed to the sound discretion of the trial court when it sits as trier of fact. *Jenkins,* 16 S.W.3d at 477, *citing Jeffers v. Wallace,* 615 S.W.2d 252, 253 (Tex.Civ.App.—Dallas 1981, no writ). The trial court is in the best position to observe the demeanor and personalities of the witnesses and can "feel" the forces, powers, and influences that cannot be discerned by merely reading the record.[10] *Id.* Thus, an abuse of discretion does not occur as long as some evidence of a substantive and probative character exists to support the

---

**9.** We find ourselves in the difficult position of offering some historical perspective in Dallas County which is available only through reference to an unpublished decision from the Dallas Court of Appeals. In *Jenkins v. Jenkins,* No. 05–98–01849–CV (Tex.App.—Dallas May 15, 2001)(not designated for publication), 2001 WL 507221, the court recognized the existence of a local rule adopted by six of the seven family law courts in Dallas County establishing a presumption in favor of restricted domicile. The Dallas Court of Appeals "specifically disapprove[d] of any local rule that establishes a presumption in favor of restricted domicile. A domicile restriction should only be made when warranted by the evidence, on a case-by-case basis." *Id.* at *5.

**10.** We find a description by the Beaumont Court of Appeals to be particularly apropos:

A trial judge is much like a conductor of an orchestra in that he or she, during trial, is best able to read from the score, hear the sounds and determine individual performances. When these matters then come before an appellate court, the ability to personally observe is lost and we are left with only the written notes.

*Warchol v. Warchol,* 853 S.W.2d 165, 169 (Tex.App.—Beaumont 1993, no writ).

trial court's decision. *Jenkins*, 16 S.W.3d at 477, *citing Valdez v. Valdez*, 930 S.W.2d 725, 731 (Tex.App.—Houston [1st Dist.] 1996, no writ).

In some instances, the abuse of discretion standard overlaps the traditional sufficiency review. *Id.* We have addressed the conflict between the traditional sufficiency review and the abuse of discretion standard in the context of a child support modification and determined that once it has been determined that the abuse of discretion standard applies, an appellate court should engage in a two-pronged inquiry: (1) Did the trial court have sufficient information upon which to exercise its discretion; and (2) did the trial court err in its application of discretion? *Lindsey v. Lindsey*, 965 S.W.2d 589, 592 (Tex. App.—El Paso 1998, no pet.). The traditional sufficiency review comes into play with regard to the first question; however, our inquiry cannot end there. *Id.* We must proceed to determine whether, based on the elicited evidence, the trial court made a reasonable decision. *Id.* Stated inversely, we must conclude that the trial court's decision was neither arbitrary nor unreasonable. *Id.; see also, In the Interest of De La Pena*, 999 S.W.2d 521 (Tex. App.—El Paso 1999, no pet.).

In considering a legal sufficiency or "no evidence" point, we consider only the evidence which tends to support the fact findings and disregard all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965); *Jenkins*, 16 S.W.3d at 477. If any probative evidence supports the judgment, it must be upheld. *Id.* We cannot substitute our conclusions for those of the trial court if there is sufficient competent evidence of probative force to support the trial court's findings. *Id.*

■ "Insufficient evidence" or factual insufficiency involves a finding that is so against the great weight and preponderance of the evidence as to be manifestly wrong. Where the party having the burden of proof complains of an unfavorable finding, the point of error should allege that the findings "are against the great weight and preponderance of the evidence." The "insufficient evidence" point of error is appropriate only when, as here, the party without the burden of proof on an issue complains of the court's findings. *Neily v. Aaron*, 724 S.W.2d 908, 912 (Tex. App.—Fort Worth 1987, no writ). The test for factual insufficiency is set forth in *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). In reviewing a point of error asserting that a finding is against the great weight and preponderance of the evidence, we must consider all of the evidence, both the evidence which tends to prove the existence of a vital fact, as well as evidence which tends to disprove its existence. It is for the fact finder to determine the weight to be given to the testimony and to resolve any conflicts in the evidence. *Carrasco v. Goatcher*, 623 S.W.2d 769, 772 (Tex.App.—El Paso 1981, no writ). The finding should be sustained if there is some probative evidence to support it and provided it is not against the great weight and preponderance of the evidence. *Id.* The parlance used by the courts of appeals is that such a finding "shocks the conscience" or that it is "manifestly unjust," limited by such phrases as "the jury's determination is usually regarded as conclusive when the evidence is conflicting," "we cannot substitute our conclusions for those of the jury," and "it is the province of the jury to pass on the weight or credibility of a witness's testimony." *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 30 (Tex.1994); *Beall v. Ditmore*, 867 S.W.2d 791, 795 (Tex.App.—El Paso 1993, writ denied). We cannot substitute our judgment for that of the fact

finder even if we find a fact contrary to that found by the jury, provided the jury finding is supported by probative evidence and is not against the great weight and preponderance of the evidence. If, however, the verdict is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the point should be sustained. In a bench trial, the findings of fact made by the trial judge are the equivalent of a jury answer in the charge and subject to the same scrutiny on appeal. *Lindsey,* 965 S.W.2d at 591.

### History of Modification Standards

Historically, Texas law has tried to ensure stability and continuity for children by imposing significant hurdles to modifications of managing conservatorship. *Jenkins,* 16 S.W.3d at 478. When the Family Code was enacted in 1973, modification of sole managing conservatorship was measured by the now familiar test of a material and substantial change in circumstances, coupled with a best interest test. *Id.* In 1975, an additional prong was added, requiring a finding that retention of the existing managing conservator would be injurious to the welfare of the child. *Id.* Twenty years later, the "injurious retention" element, as it had come to be known, was abandoned. *Id.* Until recently, Section 156.101 provided that a court could replace one sole managing conservator with another if the circumstances of the child, sole managing conservator, or possessory conservator had materially and substantially changed, and the appointment of a new sole managing conservator would be a positive improvement for the child. *Id.* A sole managing conservatorship could be replaced with a joint conservatorship upon a showing that the circumstances of the child or sole managing conservator had materially and substantially changed since the rendition of the order; retention of the sole managing conservatorship would be detrimental to the welfare of the child; and appointment of the parents as joint managing conservators would be a positive improvement for and in the best interest of the child. *See* TEX.FAM.CODE ANN. § 156.104 (Vernon 1996). The terms of a joint managing conservatorship could be modified upon a showing of changed circumstances or a showing that the order had become unworkable or inappropriate provided the modification would be a positive improvement for and in the best interest of the child. TEX.FAM.CODE ANN. § 156.202. Finally, a joint managing conservatorship could be replaced with a sole managing conservatorship if the child's present living environment posed a danger to the child's physical health or significantly impaired the child's emotional development; there had been a substantial and unexcused violation of the existing order; or the circumstances of the child or one or both of the joint managing conservators had so materially and substantially changed that the order had become unworkable or inappropriate; and the appointment of a sole managing conservator would be a positive improvement for and in the best interest of the child. TEX.FAM.CODE ANN. § 156.203.

### Applicability of 2001 Amendments

The legislative amendments to Chapter 156 during the 2001 legislative session are significant. Effective September 1, 2001, Chapter 156 provides a set of uniform standards for the modification of conservatorship. Acts 2001, 77th Leg., R.S., ch. 1289, § 5, 2001 TEX.GEN.LAWS 3108, eff. Sept. 1, 2001; *see* Sampson & Tindall, TEXAS FAMILY CODE ANNOTATED, Chapter 156, Subchapter B, *Introductory Comment,* p. 587 (2001). Under the new statute, most modifications will be based upon a showing that (1) modification would

be in the best interest of the child and (2) the circumstances of the child, a conservator, or any other party affected by the order have materially and substantially changed since the date of the rendition of the order. *See* TEX.FAM.CODE ANN. § 156.101(1)(Vernon Pamph.2002). This two-prong test applies to modifications of sole managing conservatorship, joint managing conservatorship, and possessory conservatorship. *Id.* Noteworthy is the fact that both the long-standing "positive improvement" prong and the "detrimental retention" prong necessary to replace a sole managing conservatorship with joint managing conservatorship have been deleted. We must next determine whether the amendment applies to this case.

■ Article I, section 16 of the Texas Constitution prohibits retroactive laws. *See* TEX.CONST. art. I, § 16. A statute is presumed to be prospective in its operation unless expressly made retrospective. TEX.GOV'T CODE ANN. § 311.022 (Vernon 1998). Amendments are also presumed not to apply retroactively. *Houston Independent School District v. Houston Chronicle Publishing Company,* 798 S.W.2d 580, 585 (Tex.App.—Houston [1st Dist.] 1990, writ denied). The amendment at issue here specifies that the Act takes effect September 1, 2001, and applies to an action to modify an order in a suit affecting the parent-child relationship pending on that date or filed on or after that date. Acts 2001, 77th Leg., R.S., Ch. 1289, § 13, 2001 TEX. GEN.LAWS 3111. This indicates that the Legislature intended for the amended statute to apply retroactively to those cases pending on the effective date of the amendment.

Here, the trial court had ruled on the motion to modify and the case was on appeal. In fact, the case had been submitted at the time the amendment became effective. The question we must answer, then, is whether the appeal of the trial court's ruling constitutes a *pending* "action to modify" so that the amended statute should be applied in deciding the issues presented on appeal rather than the law which existed when the trial court ruled on the motion to modify. An action or suit is "pending" from the time of its inception until the rendition of final judgment. BLACK'S LAW DICTIONARY 1291 (4th ed.1968); *see Sims v. Adoption Alliance,* 922 S.W.2d 213, 215 (Tex.App.—San Antonio 1996, writ denied)(determining whether amendment to Family Code establishing forty-eight hour waiting period between birth of child and signing of affidavit for voluntary relinquishment of parental rights was unconstitutionally retroactive where amendment applied to a suit affecting the parent-child relationship which was pending on the effective date of the amendment; holding that suit was pending where termination did not occur until eight days after effective date of the amendment); *Pan American Bank of Brownsville v. Nowland,* 650 S.W.2d 879, 883 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.), *overruled on other grounds, Crimmins v. Lowry,* 691 S.W.2d 582 (Tex.1985)(determining whether suit for breach of contract was a pending action for purposes of applying amendment to statute providing for recovery of attorney's fees). Because neither *Sims* nor *Pan American Bank* involved a case pending *on appeal* at the time the amended statute became effective, they are not helpful in determining whether the phrase "final judgment" pertains to a judgment which is final for purposes of appeal or a "final judgment" as that phrase is used to describe a judgment which has become final upon issuance of the appellate court's mandate. Therefore, we must look elsewhere for guidance.

 As a general rule, rights of action based upon purely statutory grounds may be abolished by the Legislature even after they have accrued. *American Honda Motor Co., Inc. v. Texas Dept. of Transportation–Motor Vehicle Division,* 47 S.W.3d 614, 621 (Tex.App.—Austin 2001, pet. denied), *citing Ewell v. Daggs,* 108 U.S. 143, 150–51, 2 S.Ct. 408, 27 L.Ed. 682 (1883) *and National Carloading Corp. v. Phoenix–El Paso Express, Inc.,* 142 Tex. 141, 176 S.W.2d 564, 570 (1943). When a right or remedy is dependent on a statute, the unqualified repeal of that statute operates to deprive the party of all such rights that have not become vested or reduced to final judgment. *Quick v. City of Austin,* 7 S.W.3d 109, 128 (Tex.1998). A savings clause, however, operates to preserve certain rights, remedies, or privileges that the general enactment would otherwise destroy. *American Honda Motor Co., Inc.,* 47 S.W.3d at 622. In the absence of a savings clause, amendment or repeal of a statute abrogates all causes of action based upon the old law. *American Honda Motor Co., Inc.,* 47 S.W.3d at 621–22. The Supreme Court summarized the general rule in *National Carloading:*

> If, before rights become vested in particular individuals, the convenience of the State induces amendment or repeal of the laws upon which they are based, these individuals are left without any remedy at law to enforce their claims; and if final relief has not been granted before the repeal goes into effect it cannot be granted thereafter, even if a judgment has been entered and the cause is pending upon appeal.

*National Carloading Corp.,* 176 S.W.2d at 570.

 In enacting the legislation at issue here, the Legislature applied the amendment to all pending motions to modify and did not, by express language, provide a savings clause for those cases pending on appeal. However, the Legislature has previously adopted general savings provisions which are codified in the Code Construction Act. TEX.GOV'T CODE ANN. § 311.031.[11] The Legislature's adoption of these general savings provisions indicates a general legislative policy that the repeal or amendment of any statute shall not affect the prior operation of the statute nor extinguish any liability incurred or affect any right accrued or claim arising before the repeal or amendment takes effect. *See Quick,* 7 S.W.3d at 129–30. Here, the trial court had already entered a final appealable judgment and the court's plenary power had expired long before the effective date of the amendment. This constitutes an action taken under the prior law so that the general savings provision stated in Section 311.031(a)(1) bars application of the amended law to this case. Accordingly, the rule stated in *National Carloading* is inapplicable.

---

11. Section 311.031 provides: "(a) Except as provided by Subsection (b), the reenactment, revision, amendment, or repeal of a statute does not affect: (1) the prior operation of the statute or any prior action taken under it; (2) any validation, cure, right, privilege, obligation, or liability previously acquired, accrued, accorded, or incurred under it; (3) any violation of the statute or any penalty, forfeiture, or punishment incurred under the statute before its amendment or repeal; or (4) any investigation, proceeding, or remedy concerning any privilege, obligation, liability, penalty, forfeiture, or punishment; and the investigation, proceeding, or remedy may be instituted, continued, or enforced, and the penalty, forfeiture, or punishment imposed, as if the statute had not been repealed or amended." TEX.GOV'T CODE ANN. § 311.031(a). Subsection (b) is inapplicable as it pertains to a penalty, forfeiture, or punishment for any offense. TEX.GOV'T CODE ANN. § 311.031(b).

## Relocation as Material and Substantial Change in Circumstances

■ Shannon contends that in and of itself, relocation within the State of Texas cannot constitute a material and substantial change in circumstances. Nowhere in her appellate brief does she address former Section 156.105(a) of the Texas Family Code upon which the trial court relied, at least partially. That section provided:

§ 156.105. Statutory Change of Circumstance

(a) The power of the court to order a joint managing conservatorship under Chapter 153 is a material and substantial change of circumstances sufficient to justify a modification of an existing sole managing conservatorship to a joint managing conservatorship if the sole managing conservatorship was ordered in a suit affecting the parent-child relationship in which a final order was rendered on or after September 1, 1987.

TEX.FAM.CODE ANN. § 156.105(a). Although this provision was in effect on the date the trial court entered its order, it was repealed in 2001. See Acts 2001, 77th Leg., R.S., ch. 1289, § 12(1), 2001 TEX. GEN.LAWS 3111, eff. Sept. 1, 2001. For the reasons we have already expressed, we do not believe the amendments affect a cause pending in the appellate court on the effective date of the statute. Consequently, the trial court's finding of a material and substantial change in circumstances cannot constitute an abuse of discretion inasmuch as it is statutorily authorized.

■ Nevertheless, we will address the evidence supporting the finding. Richard's testimony concerning a change in circumstances focused solely on the move to Port Lavaca and the resulting impact on Richard, Ashley, and Matthew.

Q: Now, since the divorce in 1996, have you alleged in your Motion that there's been a substantial change of circumstances?

A: Yes, there has.

Q: And what has that substantial change of circumstances been?

A: The change that Ms. Bates and the children have moved to Port Lavaca.

While Texas courts have not directly addressed this issue, other jurisdictions have. See Aaby v. Strange, 924 S.W.2d 623 (Tenn.1996), citing Taylor v. Taylor, 849 S.W.2d 319, 332 (Tenn.1993) (relocation, standing alone, does not constitute a basis for a change of custody); McDonough v. Murphy, 539 N.W.2d 313, 317 (N.D.1995)(relocation is not in and of itself a significant change in circumstances); In re Marriage of Howe, 471 N.W.2d 902 (Iowa Ct.App.1991)(move of 42 miles not a material change in circumstances); Dobbins v. Dobbins, 584 So.2d 1113 (Fla. 1st DCA 1991)(relocation from Tallahassee to Jacksonville not a material change in circumstances); Jones v. Jones, 423 N.W.2d 517 (S.D.1988)(intrastate move from Sioux Falls to Watertown allowed); Matter of Schouten v. Schouten, 155 A.D.2d 461, 547 N.Y.S.2d 126 (N.Y.A.D. 2 Dept.1989) (approving 258–mile move); Murphy v. Murphy, 145 A.D.2d 857, 535 N.Y.S.2d 844 (N.Y.A.D. 3 Dept.1988)(approving 340–mile move).

In Fossum v. Fossum, 545 N.W.2d 828 (S.D.1996), the mother moved seventy miles following the divorce, which the trial court had found to be a material and substantial change in circumstances. In reversing, the Supreme Court restated the general rule that insignificant geographical changes will not suffice and concluded that seventy miles was a "short distance." Id. at 832–33. In so doing, it distinguished In re Ehlen, 303 N.W.2d 808 (S.D.1981), in which the mother had moved the children some 1,500 miles. See also Rybicki v. Rybicki, 176 A.D.2d 867, 575 N.Y.S.2d 341

(N.Y.A.D. 2 Dept.1991)(disapproving 84–mile move); *In re Marriage of Smith,* 172 Ill.2d 312, 324, 216 Ill.Dec. 652, 657, 665 N.E.2d 1209, 1214 (Ill.1996)(relocation from Peoria, Illinois to New Jersey denied; distance prohibited weekend visits because it consisted of a flight from Peoria to Chicago, a connecting flight from Chicago to Newark, and a "substantial" drive from Newark to Newton–Sparta).

▮▮▮▮ We believe the issue is best stated by the New Mexico Supreme Court in *Jaramillo:*

> We do not hold that a proposed relocation constitutes a substantial and material change in circumstances as a matter of law, but it is difficult to imagine an instance in which a proposed relocation will not render an existing parenting plan or custody-and-visitation arrangement unworkable. As the court of appeals noted, 'a distant relocation by one parent will inevitably trigger a change of circumstances—the inability of the parties to implement their parenting agreement.'

*Jaramillo,* 823 P.2d at 309 n. 9, *citing Murphy v. Jaramillo,* 110 N.M. 336, 339–40, 795 P.2d 1028, 1031–32 (Ct.App.1990). Likewise, we do not hold that relocation, regardless of distance, will suffice to establish a material and substantial change in circumstances. But if the custodial parent moves a significant distance, a finding of changed circumstances may be appropriate. Such a decision is necessarily fact intensive but we can glean from the case law certain factors which the court should consider:

- the distance involved;
- the quality of the relationship between the non-custodial parent and the child;
- the nature and quantity of the child's contacts with the non-custodial parent, both *de jure* and *de facto;*
- whether the relocation would deprive the non-custodial parent of regular and meaningful access to the children;
- the impact of the move on the quantity and quality of the child's future contact with the non-custodial parent;
- the motive for the move;
- the motive for opposing the move;
- the feasibility of preserving the relationship between the non-custodial parent and the child through suitable visitation arrangements; and
- the proximity, availability, and safety of travel arrangements.[12]

It is clear from the trial court's findings of fact that he considered these factors. He noted that prior to the move to Port Lavaca, the children were well adjusted, doing well in school, and involved in several extracurricular activities. He found that Richard and the children have a close and loving relationship and that Richard was substantially involved in their extracurricular activities in addition to his standard periods of possession. He had completed the parenting class as recommended in the social study and was committed to being fully involved in the children's lives. As a result of the move, the children were denied the substantial involvement of their father in their activities and Richard would not be able to exercise as much visitation has he could have had the children not been moved. The court believed that as a result of the move:

> Tyler faces greater obstacles than a child traveling between Houston and Dallas. Moreover, in the wake of September 11, all parents remain cautious of children flying without adult accompaniment.

12. We recognize that we cannot write so broadly as to overlook the fact that rural areas of the state necessitate long road trips before a child may even be delivered to an airport. A child traveling between Marfa and

[T]he children were subjected to the strain of relocation; frequent air travel (generally unaccompanied by an adult); loss of social and recreational opportunities of the children with the father; loss of additional parenting times between the children and the father; and the disruption of the children's routine at the their schools and with their friends. Richard testified that the children missed school on Fridays in order to drive from Port Lavaca to the airport, and depending upon the origination of the flight, the drive took from two to three hours. The flights were frequently late and the children were tired on the following Monday. Were Richard to drive to Port Lavaca for a visit, the trip would take some six and a half hours, making a weekend visit nearly impossible.

The court also found that Shannon had never lived in Port Lavaca, that the move to Port Lavaca was voluntary rather than mandatory, that Shannon was not required to move to Port Lavaca for employment reasons, that neither she nor her husband were transferred from Dallas County, and that the economic considerations behind Shannon's move were outweighed by the importance of the children having frequent and continuing contact with their father. Moreover, there is an underlying current throughout the findings of oblique references to an avoidance or disregard of the judicial system on Shannon's part. The trial court noted that Shannon failed to give Richard proper notice of the change of residence. The record reveals that Shannon told Richard she would be moving on June 14 and that her van was loaded and ready to go at the time she was served with the restraining order. She took the position that because she had actually moved on June 9, the restraining order only prohibited her from changing the residence of the children from Port Lavaca. Whether the move really occurred on June 9 was subject to dispute. Matthew had been in Dallas for T-ball games on June 5 and June 7. Assuming Shannon moved on June 9, she turned around just days later on June 11 and took the child back to Dallas for a weekend visit with Richard. The findings indicate that Shannon also filed an unsuccessful motion to transfer the case from Dallas County. Finally, the court noted that despite the specific order that she return the children to Dallas County no later than August 14, 2000, Shannon failed to do so.

The testimony concerning the nature of the father-child relationship and the frequency and duration of Richard's periods of possession was also hotly disputed. We have already detailed the substance of Shannon's and Richard's observations. The investigator, Cindy Pittman, described a good relationship but found the children much more reserved with Richard. Significantly, she recommended a change from sole managing conservatorship to joint managing conservatorship, with Shannon having primary possession. Pittman believed Richard wanted to be actively involved in the children's life and that his involvement should be encouraged. She indicated in the social study that Shannon did not give Richard's relationship the importance it deserved. In her view, Richard was a bit too rigid and inflexible with the children and his expectations were "probably too high," but she believed him to be a good parent. She thought the distance between Dallas and Port Lavaca would impact "a little" the relationship he had with the children. She did not see that the move had affected his seeing the children "except for things like baseball games." Shannon and the children had told her that there had not been prolonged periods of visitation. She had originally recommended that Richard see the children twice a month, but she had become

concerned that as the children grew older, it would be difficult to maintain that frequency. "So I think you're just going to have to work around peoples' schedules."

Given the divergence in testimony, the fact finder, as the sole judge of the credibility and demeanor of the witnesses, resolved the conflict in Richard's favor. The evidence is both legally and factually sufficient to support a finding that there had been a material and substantial change in circumstances since the date of divorce.

### Retention of Sole Managing Conservatorship as Detrimental to Children

■ Shannon next challenges the sufficiency of the evidence to support the trial court's Finding of Fact # 47 that retention of the sole managing conservatorship would be detrimental to the welfare of the children. Indirectly, she also attacks Finding of Fact # 37 ("at this point in the children's lives, a move away from their father would be detrimental to the children, considering their ages and development"); Finding of Fact # 49(Shannon's "unilateral move of the children's residence to Port Lavaca, Texas was detrimental to [Richard's] relationship and involvement with the minor children"); and Finding of Fact # 53 (Shannon's "unilaterally moving the children's residence from Dallas County, Texas was detrimental to the welfare of the minor children").

■ Shannon contends that while relocation may be stressful to a child, the normal anxieties of a change of residence and the inherent difficulties that the increase in geographical distance between parents imposes are not "detrimental" factors. And she argues that after the move, she encouraged Richard's visitation and provided the children with access to e-mail and telephone contact. Certainly Shannon testified concerning her desire to foster the relationship between Richard and the children. She also testified, however, that the children had not called their father on his birthday because they were not "there" on his birthday. Richard testified that he called the children frequently, but they rarely called him unless he left a message and asked them to call. There was evidence that Richard's signature on the children's recent third-quarter report cards had been removed. Neither of the children's teachers had responded to his repeated telephone calls. The investigator noted that Shannon did not give Richard's relationship the importance it deserved and recommended replacing the sole managing conservatorship with joint managing conservatorship. Shannon couldn't remember whether she told the investigator that joint conservatorship would be acceptable to her.[13] At trial, she opposed it because Richard was "very controlling in what he says he wants done, and he is very hard to work with." She did not want to pay for the travel expenses. In one breath, she said that the traveling back and forth every other weekend did not put a strain on the children; in the next she proposed visitation be limited to one weekend per month. Richard testified that restricting his access to once per month would be detrimental to his relationship with the children. More significantly, the trial court specifically found in Finding of Fact # 65 that the economic facts cited by Shannon in asking that the children be allowed to remain in Port Lavaca were outweighed by the importance of the children having frequent and continuing contact with Richard. Although in her brief, she references the quality of lifestyle in

---

13. Her precise testimony was: "I'm not sure of everything that we've discussed. I might have said that; I'm not sure. I can't say that I said it for sure."

Port Lavaca and a number of benefits to the children if they remain there, she never attacks this particular fact finding.[14] Unless the trial court's findings of fact are challenged by point of error in the brief, the findings are binding on the appellate court. *S&A Restaurant Corp. v. Leal,* 883 S.W.2d 221, 225 (Tex.App.—San Antonio 1994), *rev'd on other grounds,* 892 S.W.2d 855 (Tex.1995)(per curiam); *Wade v. Anderson,* 602 S.W.2d 347, 349 (Tex.Civ. App.—Beaumont 1980, writ ref'd n.r.e.). Consequently, we conclude the evidence is both legally and factually sufficient to support a finding that retention of the sole managing conservatorship would be detrimental to the children.

### Appointment of Joint Managing Conservators as Positive Improvement

■ Shannon next complains of Finding of Fact # 46 in which the trial court determined that the appointment of joint managing conservators would be a positive improvement for the children. She indirectly challenges Finding of Fact # 54, in which the trial court found that it would be a positive improvement for the children to maintain their residence in Dallas County, and Finding of Fact # 56, in which the court found that the physical, psychological, and emotional needs and development of the children will benefit from the appointment of joint managing conservators. In her argument, she incorporates and reiterates the points urged with regard to the court's finding that retaining the sole managing conservatorship would be detrimental to the children. We shall do like-

wise. For all of the reasons we have articulated, we find the evidence is both legally and factually sufficient to support the trial court's finding of positive improvement.

### Best Interest of the Children

■ Shannon maintains that Richard failed to show that a modification would be in the best interest of the children and that he only demonstrated that his best interests would be served by relocating the children back to Dallas. The trial court entered several findings of fact with regard to best interest, all of which Shannon has appropriately challenged:

- that the appointment of Shannon and Richard as joint managing conservators was in the best interest of the children;
- that the move to Port Lavaca was not in the children's best interest;
- that it was in the best interest of the children to reside in Dallas County; and
- that it was in the best interest of the children that Richard be involved in their daily life and activities, which was best accomplished by the children living in Dallas County.

■ The Texas Family Code does not define or otherwise set out the relevant factors to be considered when determining whether modification is in the best interest of a child. In other contexts involving a "best interest" analysis, Texas courts have applied what are commonly referred to as the *"Holley* factors"—a non-exhaustive list of considerations for determining a minor's best interest. *See Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex.1976)(enumerat-

---

14. Shannon attacks the sufficiency of the evidence with regard to Finding of Fact # 47 in connection with her first point of error complaining that the trial court abused its discretion by removing her as the sole managing conservator because there was no evidence or insufficient evidence to establish the requisite elements. Findings of Fact # 37, # 49, and # 53 are attacked in her fifth issue for review, which contains a generic complaint that certain findings are not supported by the evidence. Finding of Fact # 65 is not attacked anywhere.

ing list of factors to ascertain best interest of child in parental termination context); *In re Marriage of Bertram,* 981 S.W.2d 820, 822–23 (Tex.App.—Texarkana 1998, no pet.)(applying *Holley* factors for best interest determination in conservatorship proceeding). Included are the desires of the child; the emotional and physical needs of the child now and in the future; the emotional and physical danger to the child now and in the future; the parental abilities of the individuals seeking custody; the programs available to assist these individuals to promote the best interest of the child; the plans for the child by these individuals or by the agency seeking custody; the stability of the home or proposed placement; the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and any excuse for the acts or omissions of the parent. The *Holley* court noted that the listing is by no means exhaustive, but does indicate a number of considerations which either have been or would appear to be pertinent. *Holley,* 544 S.W.2d at 371–72. In the specific context of relocation litigation, courts of other jurisdictions have considered additional factors:

- the degree to which the custodial parent's and the child's life may be enhanced economically, emotionally, and educationally by the move;

- a comparison of the quality of lifestyle;

- the negative impact of any continued hostility between the parents;

- the effect of the move on extended family relationships; and

- the child's age, community ties, health and educational needs, and preferences.

*See Tropea,* 642 N.Y.S.2d 575, 665 N.E.2d at 151; *In re Marriage of Smith,* 216 Ill.Dec. 652, 665 N.E.2d at 1213; *Carter,* 877 S.W.2d at 667–68.

The trial court interviewed the children in chambers but we do not have a record of their conversation. Nevertheless, the parties agreed that Ashley had vocalized her desire to remain in Port Lavaca. To a lesser extent, Matthew had indicated he enjoyed living there. Shannon downplayed the quality of Richard's relationship with the children and the investigator determined that Shannon did not give the relationship the significance it deserved. Richard admittedly had not exercised all of the access he was granted under the divorce decree, but he offered explanations concerning his unwillingness to disrupt the children's daytime activities by placing them in day care during prolonged visits. He has now remarried. There apparently exists a family network in Port Lavaca, including grandparents and cousins, although their role is not fleshed out in the record. Shannon expressed that the children's health had improved since the move and they were doing exceptionally well in their new school. In her opinion, Ashley's new gym far surpassed the facility in Rowlett, although she was unaware that Rowlett was building a new gymnastics facility.

The trial court specifically found that Richard had been substantially involved in the children's activities; that he had a close and loving relationship with his children; that he would not be able to exercise frequent visitation if the children remained in Port Lavaca; that the physical, psychological and emotional needs of the children were served by a joint managing conservatorship establishing their residence in Dallas County; that the children had suffered the strain of relocation; that it was in the best interest of the children that Richard be involved in their daily lives and activities; and that the "lifestyle" considerations were outweighed by the importance of the children having frequent and continuing contact with their father. These findings derive from determining the credibility,

believability, and demeanor of the witnesses, all of which is difficult for us to second-guess on a cold reading of the record. While perhaps we would not have reached the same decision, the findings are supported by legally and factually sufficient evidence.[15] Shannon's first issue for review is overruled.

## CONSTITUTIONALITY OF DOMICILE RESTRICTION

Shannon brings three distinct constitutional challenges in her second and third issues for review. She first complains that the trial court's retroactive interference with the exercise of her vested court-ordered right pursuant to the divorce decree to establish the residence of the children violates procedural due process. Second, she contends that the residency restriction violates her constitutional right to travel. Third, she challenges the trial court's ruling that she register the children in the Dallas County public schools because it unconstitutionally interferes with her right to make educational decisions concerning the children.

### *Constitutional Parental Protections*

 The United States Supreme Court has recognized that parents have a liberty interest in the care, custody, and control of their children. *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 2060–2061, 147 L.Ed.2d 49 (2000). These parental interests are a fundamental right protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Id.* at 2060. The Due Process Clause does not permit a State to infringe on this fundamental right

of parents to make child rearing decisions simply because a state judge believes a "better" decision could be made. *In re Aubin*, 29 S.W.3d 199, 200 (Tex.App.— Beaumont 2000, orig. proceeding).

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." The Supreme Court has long recognized that the amendment's Due Process Clause, like its Fifth Amendment counterpart, "guarantees more than fair process." *Aubin*, 29 S.W.3d at 204; *citing Washington v. Glucksberg*, 521 U.S. 702, 719, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). The clause also includes a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Troxel*, 120 S.Ct. at 2059–60; *Glucksberg*, 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772; *see also Reno v. Flores*, 507 U.S. 292, 301–02, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993).

The liberty interest at issue here is the interest of the parents in the care, custody, and control of their children and it is perhaps one of the oldest fundamental liberty interests recognized by the court. *Troxel*, 120 S.Ct. at 2060. More than seventy-five years ago, in *Meyer v. Nebraska*, 262 U.S. 390, 399, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), the court held that the "liberty" protected by the Due Process Clause includes the right of parents to "establish a home and bring up children" and "to control the education of their own." *Troxel*, 120 S.Ct. at 2060. Two years later, in *Pierce v. Society of Sisters*, 268 U.S. 510, 534–535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), the court again held that the "liber-

---

**15.** We made similar comments in a recent opinion in which the trial court permitted relocation. *See Franco v. Franco*, 81 S.W.3d 319, 340 (Tex.App.—El Paso 2002, no pet.).

There, as here, the evidence supported the trial court's decision, although we may have ruled differently.

ty of parents and guardians" includes the right "to direct the upbringing and education of children under their control." *Troxel,* 120 S.Ct. at 2060. The court explained in *Pierce* that "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Troxel,* 120 S.Ct. at 2060; *citing Pierce* 268 U.S. at 535, 45 S.Ct. 571, 69 L.Ed. 1070. The court returned to the subject in *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Id.* at 166, 64 S.Ct. at 442. These decisions have reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)(discussing "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child"); *Troxel,* 120 S.Ct. at 2060, *citing Glucksberg,* 521 U.S. at 720, 117 S.Ct. 2258, 138 L.Ed.2d 772.

We are cautious to note that in each of these cases, the issue was far removed from a dispute *between* the parents of a child. *Glucksberg* presented a challenge to Washington's assisted suicide law. *Flores* determined that procedures implemented by the Immigration & Naturalization Service did not deprive juvenile aliens of procedural due process. *Meyer* involved the criminal prosecution of a teacher who taught a student in German rather than in English. *Pierce* addressed Oregon's compulsory education law requiring children to attend public school through the eighth grade. *Prince* considered a challenge by a Jehovah's witness to Massachusetts' child labor laws. *Santosky* established the parameters of a termination of the parental-child relationship by a state agency. And *Troxel,* of course, involved a suit for grandparent access.

### Retroactive Interference as Due Process Violation

█ Nevertheless, some teachings of *Troxel* are pertinent here. The court first articulated a presumption that fit parents act in the best interest of their children. *Troxel,* 120 S.Ct. at 2061. In so doing, it faulted the trial court's failure to give some special weight to the mother's determination of her daughters' best interests and in effect, placing on "the fit custodial parent, the burden of *disproving* that visitation would be in the best interest of her daughters." [Emphasis in original]. *Id.* at 2062. Although we have likewise faulted the trial court below for concluding that Shannon bore the burden of proof, we find no fault with the statutory scheme authorizing domicile restrictions via modification. We reject Shannon's contention that once she exercised her exclusive right to determine the domicile of the children pursuant to the divorce decree, the trial court was without authority to require her to return to Dallas County. She has directed us to no authority supporting her argument and we have found none. Instead, her argument that she was entitled to rely on the final decree of divorce is predicated upon the traditional notion that the decree is *res judicata* as to the best interest of the children. We agree that the decree is *res judicata* as to the best interest of the children *at the time of divorce.* However, as we have already detailed, the court of continuing, exclusive jurisdiction retained the ability to modify the decree upon a

material and substantial change in circumstances. The trial court permitted Shannon to remain in Port Lavaca during the pendency of the modification action. She was ordered to return the children to Dallas County after a full hearing on the merits during which Richard presented sufficient evidence to justify the modification. We find no retroactive interference nor any due process violation.

### *Infringement on Constitutional Right to Travel*

■ We further reject Shannon's contention that the domicile restriction violates her right to travel. We begin with the Texas Supreme Court's decision in *Ex parte Rhodes*, 163 Tex. 31, 352 S.W.2d 249 (Tex.1961). At issue was a consent decree which awarded exclusive custody to the mother while providing visitation to the father "at all reasonable times and places." The decree also contained a provision establishing the child's residence in Karnes County and prohibiting the mother from moving the child's residence without prior court approval. Some six years later, the mother and her second husband moved to Brazos County. Following contempt proceedings, the mother sought habeas corpus relief, contending that the district court lacked the authority to restrict the child's residence to Karnes County. The Supreme Court determined that the residency restriction was not void and thus not subject to collateral attack in a habeas proceeding. *Id.* at 251. It declined to express an opinion as to whether a denial of the mother's request to relocate "may materially restrict the right of a citizen (who would not move without her child) to change the place of his or her residence. If permission to move were denied, she would be in a better position to assert that she was deprived of her liberty without due process." *Id.*

However, the San Antonio Court of Appeals has recently determined that requiring the mother, as a condition of joint managing conservatorship, to have the children reside in and attend schools in Bexar County in no way restricted the rights of the mother to change her own address and domicile. *Lenz v. Lenz*, 40 S.W.3d 111, 113 (Tex.App.—San Antonio 2000, pet. granted).

> We find no merit to Romy's claim that the trial court's action infringes on her U.S. Constitutional right to travel. This right embraces three different components: the right to enter and leave another State; the right to be treated as a welcome visitor while temporarily present in another State; and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State. *Saenz v. Roe*, 526 U.S. 489, 490, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999). Because the trial court's order in no way affects Romy's ability to return to Germany, the trial court's order does not interfere with: (1) her right to enter and leave another State; (2) her right to be treated as a welcome visitor in another State; or (3) her right to be treated like any other citizen of Texas who voluntarily subjects herself to the jurisdiction of the court system by filing a divorce proceeding. Accordingly, we reject this argument.

*Id.* at 118 n. 3. This analysis is somewhat at odds with the approach taken by the New Mexico Supreme Court in *Jaramillo:*

> [I]t makes no difference that the parent who wishes to relocate is not prohibited outright from doing so; a legal rule that operates to chill the exercise of the right, absent a sufficient state interest to do so, is as impermissible as one that bans exercise of the right altogether.

*Jaramillo,* 113 N.M. at 64, 823 P.2d at 306. Yet even that court stopped short of finding domicile restrictions unconstitutional. It simply articulated a procedure for determining relocation disputes, allowing either party to initiate a modification proceeding and placing the burden on the party seeking to alter the existing court order to demonstrate a change of circumstances. Surprisingly, the court directed that neither parent has the burden to show that relocation will either be in the child's best interest or contrary thereto; "[e]ach party will have the burden to persuade the court that the . . . parenting plan proposed by him or her should be adopted . . . ." *Jaramillo,* 823 P.2d at 309.

Other courts have agreed with the constitutional parameters while disagreeing with the placement of the burden of proof:

> We conclude that the Legislature's broad grant of authority to the trial courts to devise parenting plans which will promote the best interest of the child includes the authority to restrict a parent from relocating the child. Because the right to travel and to choose where one will live and work is embodied among those liberties found in the United States Constitution, however, the trial court's statutory authority is tempered. Restrictions such as those contained in the Sheley–Nichols parenting plan may not be imposed absent a showing of specific detriment to the child if the child is relocated. Even then, the detriment to the child must be balanced against the social, professional, economic and psychological advantages of the move to the parent desiring to relocate with the child. Primary residential care may be conditioned upon a parent remaining in a particular locale only if the detriment to the child outweighs the advantages of the move and only if the best interests of the child would be better served by remaining in the geographical locale in the primary residential care of the other parent, than by relocating with the parent who would otherwise be designated the primary residential parent.

*In re Marriage of Sheley,* 78 Wash.App. 494, 495, 895 P.2d 850, 852 (Wash.App. 1995). Wyoming has followed suit:

> The right to travel freely throughout the state is a necessary and fundamental aspect of our emancipated society, and it is retained by the citizens. It indeed would be incongruent to identify a fundamental right to travel protected by the Constitution of the United States with respect to interstate travel, and yet to conclude that the right to travel intrastate is inhibited. . . . The right of travel enjoyed by a citizen carries with it the right of a custodial parent to have the children move with that parent. This right is not to be denied, impaired, or disparaged unless clear evidence before the court demonstrates another substantial and material change of circumstance and establishes the detrimental effect of the move upon the children.

*Watt v. Watt,* 971 P.2d 608, 615–16 (Wyo. 1999). Here, the trial court conducted such a balancing test and determined that the economic facts recited by Shannon in asking that the children be allowed to remain in Port Lavaca were outweighed by the importance of the children having frequent and continuing contact with Richard. Shannon has not attacked this finding on appeal and, as we have already mentioned, it is binding upon us.

### Interference with Right to Make Educational Decisions

While we appreciate Shannon's concern regarding her right to enroll the children in private school, we believe she has misconstrued the trial court's ruling. The specific provision in issue provides:

IT IS ORDERED that SHANNON M. BATES shall return the children, ASHLEY NICOLE TESAR and MATTHEW RICHARD TESAR, to Dallas County to establish their residence, in time to register for school; which shall be no later than August 14, 2000, when the public schools resume in Dallas County.

The reference to the Dallas County public schools, although perhaps inartfully drafted, operates only to establish a time frame within which the children were to be brought back to Dallas. The court required Shannon to establish the children's residence in Dallas County in time to register for school during the fall semester of 2000. The phrase "in time to register for school" is imprecise; conceptually, classes could resume on different dates depending upon the school in which the children were enrolled. To ensure enforceability, the order required a specific date. The trial court opted to specify the date that the public schools resumed in Dallas County. It did not require that Shannon enroll the children in public schools. Richard concedes as much in his brief. Issues Two and Three are overruled.

## FAILURE TO RESTRICT DOMICILE TO CONTIGUOUS COUNTIES

■ In her fourth issue, Shannon complains that the trial court erred in restricting the children's residence to Dallas County without including the counties contiguous thereto. Once again, we trace some historical development through legislative amendments. Prior to 1999, Section 153.134(b)(1) provided:

(b) In rendering an order appointing joint managing conservators, the court shall:

(1) establish the county of residence of the child until altered by further order, or designate the conservator who has the exclusive right to deter-

mine the primary residence of the child . . . .

As of September 1, 1999, the statute was amended to provide:

(b) In rendering an order appointing joint managing conservators, the court shall:

(1) designate the conservator who has the exclusive right to determine the primary residence of the child and:

(A) establish, until modified by further order, a geographic area consisting of the county in which the child is to reside and any contiguous county thereto within which the conservator shall maintain the child's primary residence; or

(B) specify that the conservator may determine the child's primary residence without regard to geographic location.

TEX.FAM.CODE ANN. § 153.134(b)(1) (Vernon Supp.2002). Pursuant to the enabling statute, the amendment applies to an order in a suit affecting the parent-child relationship rendered on or after that date regardless of the date that the suit was filed. *See* Acts 1999, 76th Leg., R.S., ch. 936, § 3, 1999 TEX.GEN.LAWS 3674, eff. Sept. 1, 1999. Without question, this statute is applicable inasmuch as the trial below commenced on April 11, 2000. Consequently, we must consider whether the trial court abused its discretion in limiting the domicile restriction solely to Dallas County. We have found only one published decision addressing the discretion of the trial court to restrict a child's domicile to a specific county despite the statutory language. In *Lenz,* the court adopted the father's contention that restricting the domicile solely to Bexar County was permissible because the trial court retains broad discretion in crafting a restriction that is responsive to and effectuates the best interest of the child in the absence of statutory language specifying how the trial

court is to assign or implement such a geographic restriction. *Lenz*, 40 S.W.3d at 117.[16] While not of precedential value, one other court in an unpublished opinion has permitted a restriction to Travis County and one contiguous county.

■ Here, the trial court made specific fact findings with regard to this issue:

38. The Court finds that Dallas County, Texas is the heart of a large metropolitan region, which has experienced and continues to experience population growth which, in turn, has led to significant road and freeway congestion and delay.

39. This congestion and delay extends to counties contiguous to Dallas County.

40. This congestion and delay likely would operate to reduce, as a practical matter, the time [Richard] and the children could spend with each other because of the time and travel involved, if the children and [Richard] lived in different, but adjacent, counties.

41. This congestion and delay likely would operate to reduce, as a practical matter, the opportunity and length of time [Richard] could spend attending the children's school functions and extra-curricular activities because of the time and travel involved, if the children and [Richard] lived in different, but adjacent, counties.

Shannon has not attacked any of these findings and they are binding upon us. Moreover, the record established that prior to the move to Port Lavaca, Shannon and the children were living in Garland, the children were enrolled in private school in Carrollton, and Ashley's gym was in Rowlett.[17] Shannon herself testified

that the commute throughout the metropolitan area was part of the reason she moved to Port Lavaca:

It was putting a lot of stress—or it had been for years—to stay here in this area and have to go from one place to another to get everybody back and forth to all their activities, to hold a job and still get them to their activities without interfering and causing, you know, reason to be fired because you were taking off all the time.

■ It appears to us that the 1999 amendment was designed to expand the discretion of the trial court rather than restrict it. Under the former language, the court had two options—designate a county of residence, or allow one parent the unfettered ·right to determine the child's residence. The revised language requires the court to specify which parent shall determine the residence of the child and then permits the court to establish a geographic area in which that parent shall establish the child's residence or allow the parent to establish the residence without restriction. The court may define this geographic area as "the county in which the child is to reside and any contiguous county thereto . . . ." Six counties surround Dallas County—Denton, Collin, Tarrant, Ellis, Rockwall, and Kaufman. Usage of the word "any" suggests that the court could select Dallas and Tarrant Counties, or Dallas and Collin Counties. It is also a reasonable construction that the court could select "all" contiguous counties. Because the trial court articulated specific findings for its decision, and because Shannon has not challenged these findings, we find no abuse of discretion. We overrule Issue Four.

---

16. *Lenz* relies on our opinion in *Jenkins* in support of its holding. However, our opinion there was predicated upon the former version of Section 153.134(b)(1). *Jenkins*, 16 S.W.3d at 482–83.

17. Garland, Carrollton, and Rowlett all lie within Dallas County.

## MISCELLANEOUS ERRONEOUS FINDINGS

█ Finally, in her fifth issue for review, Shannon attacks numerous findings of fact and challenges the sufficiency of the evidence to support them. All but one of these have already been directly or indirectly addressed in connection with our review of the evidence to support the modification.[18] We agree, however, that there is no evidence in the record to support Finding of Fact # 72—that Shannon failed to return the children to Dallas County and establish their residence in time to register them for school in August 2000. The trial was completed in April 2000, and we have no record of any evidentiary hearings occurring after that date. However, Shannon has failed to conduct a harm analysis concerning the error and we perceive none. Her fifth and final issue is overruled. Having overruled all issues presented for review, we affirm the judgment of the trial court.

18. Specifically, Shannon challenges Finding of Fact # 15 (Shannon failed to give Richard the statutory notice of her change of residence); Finding of Fact # 33 (Richard was substantially involved in the children's extracurricular activities in addition to his standard scheduled visitation with the children); Findings of Fact # 34 and # 35 (the children will be denied the substantial involvement of their father in their extracurricular activities as a result of the move to Port Lavaca; Richard will be denied substantial involvement in his children's activities as a result of the move); Finding of Fact # 37 (a move away from their father would be detrimental to the children, considering their ages and development); Findings of Fact # 49, # 50, # 53, and # 55 (Shannon's unilateral decision to move the children to Port Lavaca was detrimental to Richard's involvement with the children; was not in the children's best interest; was detrimental to their welfare; and subjected the children to the strain of relocation, frequent air travel, loss of additional parenting time, and disruption of their routine); Finding of Fact # 56 (the physical, psychological, and emotional needs and development of the children will benefit from the appointment of the parents as joint managing conservators); Finding of Fact # 66 (there would be no substantial hardship on Shannon to return the children to Dallas County); Finding of Fact # 67 (it is in the best interest of the children for Richard to be involved in their daily life and activities which is best accomplished by the children residing in Dallas County); and Finding of Fact # 72 (Shannon failed to return the children to Dallas County and establish their residence in time for them to register for school in August 2000).