COURT OF APPEALS









COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL
PASO, TEXAS

 

GEORGE CISNEROS,                                         )

                                                                              )              
No.  08-03-00477-CV

Appellant,                          )

                                                                              )                    Appeal from the

v.                                                                           )

                                                                              )                 
383rd District Court

SONIA DINGBAUM,                                          )

                                                                              )            
of El Paso County, Texas

Appellee.                           )

                                                                              )               
(TC# 2000CM6643)

                                                                              )

 

 

O
P I N I O N

 

This appeal arises
from a final order in a suit to establish parentage, in which the trial court
established Appellee Sonia Dingbaum as the parent joint managing conservator
with the exclusive right to establish the child=s
primary residence without regard to geographical restriction, subject to
certain conditions and restrictions.  In
his sole issue, Appellant George Cisneros contends the trial court erred in
refusing to restrict the child=s
domicile to El Paso County, Texas.  We
affirm.








On October 17,
2000, Mr. Cisneros filed a voluntary paternity action to establish his
paternity of M.S.C., f/k/a M.S.D., the child who is the subject of this
suit.  M.S.C. was born on July 20,
2000.   It is undisputed that Mr. Cisneros
is the father of M.S.C., nor do the parents contest their status as parent
joint managing conservators with Mrs. Dingbaum having the exclusive right to
establish the primary residence of the child. 
Rather, the primary contested issue in hearings before the trial court
was Mr. Cisneros= request
that the trial court impose a domicile restriction on the child=s residence that would limit M.S.C.=s primary residence to El Paso
County, Texas.  

M.S.C.=s mother, Appellee Sonia Dingbaum f/k/a
Sonia Lazaro, was dating both Mr. Cisneros and her future husband Captain Jay
Dingbaum when she became pregnant with M.S.C. 
At the time, Mr. Cisneros was dating Mrs. Dingbaum and his future wife,
Monica Cisneros.  Mr. Cisneros and
Mrs. Dingbaum tried to work out problems in their relationship, but eventually
stopped dating early in the pregnancy around December 1999 or January 2000.  Mrs. Dingbaum pursued her relationship with
Captain Dingbaum and they later married in July 2001.  Mrs. Dingbaum believed that Mr. Cisneros
was most likely the father of her unborn child, but both Mr. Cisneros and
Captain Dingbaum participated in various prenatal activities.  








When M.S.C. was
born, Captain Dingbaum was named as the child=s
father on the birth certificate, which Mrs. Dingbaum admitted was a bad
decision.  Mrs. Dingbaum stated that
M.S.C. was given her future husband=s
last name on the advice of her attorney. 
In the early months before DNA results were known, Mrs. Dingbaum would
bring M.S.C. to Mr. Cisneros=
house for visits.  Mrs. Dingbaum admitted
that if the car of Mr. Cisneros=
then-girlfriend Monica was in the driveway or on the street, she would not
proceed with the visit.  Mrs. Dingbaum
conceded that as a first-time mother, she was overprotective with M.S.C., was
jealous, and did not show a lot of maturity at that time.  Mr. Cisneros=
access to M.S.C. was controlled by Mrs. Dingbaum and he continually asked for
more time with M.S.C. than the two-hour periodic visits he was provided.  Mrs. Dingbaum stated she was trying to do
what was best for M.S.C. by following visitation guidelines referred to her by
her attorney at the time.

On July 17, 2001,
Mr. Cisneros filed a second amended petition requesting temporary orders on
joint managing conservatorship, child support, visitation and access, and
Mrs. Dingbaum requested the same in a pleading filed the same day.  The matter was heard the following day, but
the trial court signed its temporary orders on October 1, 2001.  The trial court found Mr. Cisneros was the
father of the child and ordered a change of name.  Mr. Cisneros and Mrs. Dingbaum were named as
parent temporary joint managing conservators with Mrs. Dingbaum having the
right to establish M.S.C.=s
primary residence within El Paso County, Texas. 
Under the court=s
order, Mr. Cisneros had a possession schedule of forty-eight hours a week with
M.S.C., which included overnight stays, and evidence at the hearings showed
that the parties had abided by that schedule and other court-ordered
requirements.[1]

At the March 2002
hearings, Mr. Cisneros testified that he is a business owner in El Paso, and
since October 2001, he has been married to Monica Cisneros.  He and his wife live with her two sons from a
previous marriage.  At the time of the
hearings, the boys were ages nine and seven. 
Since M.S.C. was born, Mr. Cisneros took an active role in care-giving
responsibilities for the child.  Mrs.
Dingbaum agreed that Mr. Cisneros was a very hands-on and a very involved
parent.  She did not dispute that Mr.
Cisneros and his wife have a very happy, loving home and that M.S.C.=s relationships with his stepbrothers
was loving, significant, and meaningful. 
She also agreed that the Cisneroses as parents were good and loving
people and were very 








family-oriented.  Mrs. Dingbaum agreed that Mr. Cisneros
interacts with his son in a meaningful way and that the time M.S.C. has spent
with his father has been good for the child. 
Mr. Cisneros testified that his family in El Paso and particularly his
wife=s
extended family in El Paso gather frequently for get-togethers.  Mrs. Dingbaum agreed that M.S.C.=s cousins were wonderful playmates and
that she had no reason to believe that M.S.C.=s
relationships in the Cisneros extended blended family were nothing but
positive, good, and nurturing for M.S.C.

Mrs. Dingbaum met
her husband Captain Dingbaum in February 1999 and knew at that time he was a
career army officer.  Captain Dingbaum is
a certified registered nurse anesthetist in the U.S. Army and has been in the
military since 1996.  Both his parents
are nurses in the military, his father is a nurse anesthetist like himself, and
he recalled that his family was stationed at a number of bases, including an
overseas assignment, while he was growing up. 
She and Captain Dingbaum married in July 2001 and their son V.D., M.S.C.=s half-sibling, was born in December
2001.  Captain Dingbaum testified that
there were two locations in El Paso that he could be assigned to and he had
already been assigned to both, but was trying to be reassigned back to the
other El Paso unit.[2]  However, he expected the Army to reassign him
to another unit outside of El Paso in June 2002.[3]








Mrs. Dingbaum
testified that her husband is an incredible stepfather to M.S.C. and that
M.S.C. looks forward to seeing him when he comes home.  Captain Dingbaum was continuously supportive
of her throughout the pregnancy, with M.S.C.=s
birth, and onward.  Mrs. Dingbaum is
currently a stay-at-home mother.  As of
the hearing, Mrs. Dingbaum had no intention of going back to work, but rather
wanted to devote her time to M.S.C. and infant son V.D.  Mrs. Dingbaum informed the court that
M.S.C. is very involved in his baby brother=s
life and they enjoy interacting together. 
Not taking anything away from M.S.C.=s
relationship with his father, Mrs. Dingbaum believed that she, M.S.C., V.D.,
and her husband had established a family together.  If they had to move, Mrs. Dingbaum felt they
should go as a family and that separating M.S.C. from her as the primary
care-giver would be more devastating for M.S.C. than anything else.

Mrs. Dingbaum
agreed that M.S.C.=s
relationship with his father is very important, but when asked in her
deposition whether her husband=s
career was more important than that relationship, she stated it was difficult
to answer because her husband=s
career is very important to him.  Mrs.
Dingbaum believes that her husband=s
military service is important to him and to their family.  She agreed that this goal and dream of his
career in the U.S. Army was very much formulated by her husband=s life experience and influenced by his
family life while growing up.  Mrs.
Dingbaum admitted that she told Mr. Cisneros=
counsel that a discussion with her husband about the possibility of him
resigning his commission and moving into the private sector was Anot even in the cards.@ 
Mrs. Dingbaum believed that her husband=s
commitment to the military would have a positive impact on M.S.C.=s life. 
She did not see his service to the country as a negative thing and
believes he is a role model for M.S.C.








Given M.S.C.=s bond and attachment to his father,
Mrs. Dingbaum believed that their relationship could continue to grow,
regardless of the separation, if they maintained quality time together.  Mrs. Dingbaum offered a proposed possession
schedule dependent upon where they were relocated.  If relocated within the United States, M.S.C.
could spend two consecutive weeks with Mr. Cisneros, every three months, and
within one quarter during the year, he could have three consecutive weeks, not
to interfere with specific arrangements for Christmas and M.S.C.=s birthday.  When M.S.C. is school-age, Mrs. Dingbaum
proposed two uninterrupted months in the summer and the standard possession
orders for all other periods of possession. 
If there was a global relocation, Mrs. Dingbaum suggested that Mr.
Cisneros have two, five-week periods separated by three months, not to
interfere with specific arrangements for Christmas and M.S.C.=s birthday.  Mrs. Dingbaum again proposed two
uninterrupted months in the summer and the standard possession orders for other
periods of possession when M.S.C. is school-aged.  Mrs. Dingbaum also stated she was
willing to notify Mr. Cisneros of any plans for return visits to El Paso, which
would allow for unscheduled visits with his son.  

In addition to the
proposed possession schedule, the Dingbaums were willing to assist in
maintaining M.S.C.=s
relationship with his father by providing videoconferencing on their home
computer and telephone contact.  They
were also willing to have Mr. Cisneros and his family stay with them for visits
and to lend them the use of one of their cars while visiting.  Mrs. Dingbaum was open to any
suggestions to try to help their situation. 
She was also willing to talk about adjustments to her proposal, but did
not think a 50/50 division of time was appropriate for the child or in his best
interest.  








Mrs. Dingbaum
testified that her motive for leaving El Paso was to follow her new family and
that keeping the family unit together was very important.  She stated that leaving El Paso would be hard
for her as well.  Mrs. Dingbaum was born
and raised in El Paso, loves the city, and considers it her home.  Both her parents, her siblings, and her
sibling=s children
still live in El Paso and they have a close relationship.  Mrs. Dingbaum agreed that if it were
possible, staying in El Paso County would be in M.S.C.=s
best interest given the stability of extended family and the surroundings,
however, this was impossible because she would have to follow her husband if he
were relocated.

Mrs. Dingbaum
testified that it would not be in M.S.C.=s
best interest to be separated from her and that, as his mother, she is
nurturing and has an instinctual bond with the child.  She did not believe that the good
relationship that M.S.C. has with his father would be harmed if they were to
leave El Paso, but that separating the child from her would be devastating for
him.  In Mrs. Dingbaum=s opinion, Mr. Cisneros could do all
the things he has been doing as a good father under the proposed possession
schedule.

Mr. Cisneros
testified that he was not asking for custody, but rather he wanted equal access
to M.S.C. and to have the child=s
primary residence restricted to El Paso for a number of reasons.  Mr. Cisneros believed that it was important
to the parent-child relationship that a parent be there for the child=s firsts, like riding a bike, teaching
him to swim, or to be kind-- all the things that a parent might miss if that
parent was not there.  He did not think
he or M.S.C. should miss out on being with each other for these milestones in
the child=s
life.  Mr. Cisneros stated that the
longer periods of possession in the temporary orders have made a huge
difference in his relationship with his son. 
They have been able to enjoy their time together, including the
experience of bedtime rituals with the overnight stays.








Mr. Cisneros
agreed that Mrs. Dingbaum is a good mother and that she loves M.S.C. as does
he.  He did not want to separate M.S.C.
from his mother or his baby brother V.D. and thought that her family should be
kept intact, but also believed that he was M.S.C.=s
family as well.  Mr. Cisneros did not
think it would be possible to continue the type of relationship that M.S.C.
deserves to have with his father and with his mother if M.S.C. was allowed to
leave with Mrs. Dingbaum.  In Mr.
Cisneros= opinion,
M.S.C. deserves to have his father and his mother in his life on a daily,
weekly, and monthly basis, that is, he needs to have them there for him all the
time.  Mr. Cisneros desired that he, Mrs.
Dingbaum, and M.S.C. live in the same city so that they can each enjoy raising
M.S.C. and M.S.C. can enjoy both his parents. 
Mr. Cisneros was certain that any periodic visits between him and M.S.C.
would be full of quality time, but that M.S.C. deserved more than that.  Mr. Cisneros has much to offer and teach
M.S.C., but he doubted that he would be able to instill some of those values if
M.S.C. does not live with or near him. 
His biggest fear was that some day M.S.C. would ask why he did not spend
more time with his father and whether it was because his father did not love
him.








Mr. Cisneros= only complaint against Captain
Dingbaum was that his career choice was going to greatly impact his
relationship with his son.  In Mr.
Cisneros= opinion,
Captain Dingbaum was making a choice to be in the military and that he was not
enslaved to it.  He believed that Captain
Dingbaum=s dream
of being in the military was being put above M.S.C.=s
right to have both his parents in his life. 
Mr. Cisneros felt there was no reason that Captain Dingbaum should have
to move away when he has the ability to choose any job he wants in the private
sector.  Mr. Cisneros suggested that
Captain Dingbaum could serve his country by joining the reserves or the
national guard and still live in El Paso. 
Mr. Cisneros admitted stating in his deposition that Captain Dingbaum
was being selfish by putting his career ahead of M.S.C.=s
relationship with his father.

As already noted,
Captain Dingbaum is a certified registered nurse anesthetist in the U.S.
Army.  While in college, Captain Dingbaum
gained an interest in the health-care field. 
His first job was in Tampa, Florida at a veteran=s
hospital and after that, he decided to join the U.S. military and was assigned
to San Antonio, Texas.  He was then
stationed in Hawaii for eighteen months before moving to El Paso, where he was
assigned to William Beaumont Medical Center. 
Captain Dingbaum expected two or more moves during the remainder of his
career.  He agreed that literature from
the Army about the health-care field informs enlistees that they can expect
multiple assignments and probably at least one tour of duty outside the continental
United States.  Captain Dingbaum is on
active duty and has been in the military for close to six years.  Because of the education he has received
while in the military, he owed the U.S. Army an obligatory payback period until
January 2003.  Captain Dingbaum did not
think his five years served would count towards retirement if he never returned
to any type of military service.








Captain Dingbaum=s nursing background includes prior
experience in telemetry, critical care nursing, and intensive-care
nursing.  He is licensed as a certified
registered nurse anesthetist in Texas and in Georgia.  He is certified in the areas of advanced
cardiac life support and pediatric advanced life support.  Captain Dingbaum agreed that nurse
anesthetists are in high demand in the private sector, but he did not know what
was available in El Paso.  He did not
know of any career scenario where an anesthesia practicing nurse would go back
to practicing telemetry or intensive care unit nursing.  According to Captain Dingbaum, there is a
demand in the active duty for certified registered nurse anesthetists in the
U.S. Army.  He finds the job to be significant
and very relevant.  Captain Dingbaum did
not know what the demand was for certified registered nurse anesthetists in the
reserves.  He did not know if he could
serve in the reserves in El Paso because this depends upon the number of
available slots for certified registered nurse anesthetists.

Captain Dingbaum
admitted that in his deposition he stated he did not want to resign his
commission because he enjoyed serving in the army, enjoyed the opportunities
the Army provides him, enjoyed the pride he feels when wearing the uniform, and
enjoyed the comradery of his coworkers. 
Captain Dingbaum felt devoted to both his family and to his service and
was proud that both he and his parents were serving in the armed forces.  Captain Dingbaum agreed that the goals of his
family, the best interest of M.S.C., stability, continuity of family
relationships, and maximizing M.S.C.=s
time with both parents, are achieved more conveniently by staying in El
Paso.  However, he and his wife believed
that these goals could also be met with him serving in the Army.  Captain Dingbaum stated that they were going
to try to maintain M.S.C.=s
relationship with his father and he felt that the relationship will still be
good for M.S.C.  He was firm that
avoiding physical separation from the immediate Dingbaum family was in M.S.C.=s best interest and that they could
maintain the father-son relationship with him still serving in the Army.  Captain Dingbaum=s
interactions with Mr. Cisneros have been pleasant, civil, and
conversational.  Captain Dingbaum
respects Mr. Cisneros as a father and believed he could communicate to Mr.
Cisneros the progress issues that concerned Mr. Cisneros during those periods
of separation between M.S.C. and his father.








Hector Escobar is
an executive medical recruiter with DM Dickason Personnel Services in El
Paso.  Mr. Escobar specializes in
recruiting nurses, registered nurses, certified nurses, physical therapists, radiation
therapists, and other technical positions in the health and medical field.  Mr. Escobar deals with all the medical
facilities and hospitals in the area and based on Captain Dingbaum=s credentials, he would classify him as
one of the most marketable applicants. 
Mr. Escobar testified that Captain Dingbaum=s
status as a certified registered nurse anesthetist is very sought after and
that he would be considered a very qualified candidate.  Being very conservative, Mr. Escobar believed
that Captain Dingbaum would qualify for at least 900 positions currently
available in the nursing field in the area. 
Captain Dingbaum earns $43,000 working full-time in the Army.  According to Mr. Escobar, Captain Dingbaum
could earn at least $60,000 working full-time in the private sector.  On cross-examination, Mr. Escobar did not
know how many openings there were in El Paso for comparable work in Captain
Dingbaum=s
specialty.  However, he believed that if
he presented Captain Dingbaum as a job candidate at any area hospital, within
twenty-four hours Captain Dingbaum would be working with any of those
institutions.

At the hearings,
two psychologists, Dr. Karen Gold and Dr. Luis Natalicio, testified as experts
in child psychology, the psychodynamics of parent-child relationships, and
child development.  Dr. Gold had been
contacted in this case to provide a bonding assessment with respect to M.S.C.
and his father.  Dr. Gold observed the
child with his father on a few occasions, but had not personally met Captain
Dingbaum or Mrs. Dingbaum nor did she observe M.S.C. with the Dingbaums.  In their first meeting in July 2001, Dr. Gold
had a general discussion with Mr. Cisneros about effective parenting and child
development issues.  She recalled that
the father and child were very close and that she observed a great deal of
nonverbal communication of mutual affection.








The second meeting
was on February 5, 2002.  M.S.C. was
about sixteen or seventeen months old and he was obviously getting over a cold
and not feeling very well.  M.S.C. was
clingy with his father, but did not cry. 
He appeared very receptive to his father talking to him about his not
feeling well.  Dr. Gold thought Mr.
Cisneros was very caring and comforting with M.S.C.  Mr. Cisneros informed Dr. Gold that for
approximately seven months, he had greater access to M.S.C.  M.S.C. was seeing his father five days a week
and things were going very well.

On February 12,
2002, Dr. Gold observed M.S.C. with his father, stepmother, and two
stepbrothers.  M.S.C. was having a
wonderful time with the two boys and she observed an extremely healthy
interaction between the children.  M.S.C.
was engaging all the adults with the toys and equally apportioned his time with
his father and stepmother in showing them items from the toy box.  Based on her observations, it was Dr. Gold=s opinion that Mr. Cisneros is a very
devoted, very focused father.  At no time
did he denigrate M.S.C.=s
mother or the importance of the mother=s
role.  Based on deposition testimony, it
was Dr. Gold=s opinion
that in terms of M.S.C.=s
relationships with his mother and his father, neither of the parents is the
singular, primary parent in the child=s
life.








Dr. Gold
criticized the work of Dr. Judith Wallerstein which is based on older
psychological research espousing the concept of primary parents and a primary
bond to the mother.  Dr. Gold stated
there was no empirical scientific support for Wallerstein=s claims that a child=s relationship with the mother is the
central protective factor in the child=s
future adjustment and development. 
Rather, it is important that the child have a very appropriate and
healthy access to both parents.  Dr. Gold
stated it was in a child=s
best interest to have access to as many healthy, loving role models and nurturing
figures as possible.  In Dr. Gold=s opinion, Wallerstein and some of her
colleagues are gender biased and do not give adequate importance to the role
that fathers play in their children=s
moral and emotional development.  Dr.
Gold stated that literature shows that at every age, a child will gain
something from contact with each parent, whether the child is an infant,
toddler, or school-aged.

Dr. Gold disagreed
with Wallerstein=s notion
that relocation is fine even if the non-relocating parent does not see the
child frequently because the quality of visits is what is important, not the
quantity.  In Dr. Gold=s view, what often happens is that the
non-relocating parent has an unnatural relationship with the child by trying to
build in as many pleasurable activities as possible so as not to have any less
of the child=s experiences
with him.  Unless there was an extremely
compelling reason otherwise, Dr. Gold believed that the quantity of time needs
to be equal in addition to having excellent quality time.








Dr. Luis Natalicio
testified about his observations of M.S.C., his mother, and stepfather during a
recent visit to their home and generally about current relevant literature on
child psychology.  Dr. Natalicio recalled
that the interaction between M.S.C. and his mother was very consistent with
securely attached children and their parent or parents.  He disagreed with Dr. Gold=s conclusion that there was no primary
caretaker in this particular case.  Dr.
Natalicio stated that the literature is very clear that there is a primary
caretaker role.  The primary caretaker is
the base for the child--he or she is the person to whom the child has a secure
attachment or bond.  Based on his
understanding from testimony and documents he reviewed, Mrs. Dingbaum and Mr.
Cisneros did not succeed in forming a family unit during M.S.C.=s gestation and separated.  From that point on, Mrs. Dingbaum had Captain
Dingbaum=s support
and love for the balance of the pregnancy to the present.  When M.S.C. was six months old, Mrs. Dingbaum
and Captain Dingbaum formed a family unit, moved in together with M.S.C., had a
child, V.D., and according to Dr. Natalicio, this family unit contains the
elements of attachment that one would expect to find in a child that is
developing normally, appears to be content, and in all likelihood will continue
in a healthy adjustment and developmental path.

In Dr. Natalicio=s opinion, historically M.S.C. has a
primary secure attachment to his mother, which extends to his father.  In explaining his opinion, Dr. Natalicio
stated that Mr. Cisneros is bonded to this child because the child already had
a secure bond with his mother, who is the one that provides the child with the
security and sense of safety available for the child to go forward and relate
to others in the world.  Dr. Natalicio
denied that his conclusion about the primary caretaker in this case was based
on gender.  He did not believe that women
were uniquely suited to rear children. 
Attachment had nothing to do with gender, but rather had to do with
primary caretaker relationships.

Dr. Natalicio had
no disagreement with Dr. Gold=s
opinion regarding the lack of empirical support for Dr. Wallerstein=s opinions and he agreed that the vast
majority of researchers in the field agree that Wallerstein=s sample was a limited one and her
conclusions were overreaching.  With
regard to Wallerstein=s
idea that when a primary caretaker is secure, the child is secure, Dr.
Natalicio explained that this result does not necessarily follow.  However, what does follow is the inverse,
that is, when the primary parent is distressed, there is a much greater
likelihood that the child will be distressed. 
According to Dr. Natalicio, there is empirical research that clearly
indicates that a distressed parent is unlikely to be able to maintain an
adequate adjustment for a child who is bonded to that parent.  In this sense, the well-being of the parent
is critical to that child=s
development.








Dr. Natalicio
agreed that ideally balanced access to both parents is in the best interest of
a child if the parents are not in conflict and are separated, but are able to
cooperate with one another.  He agreed
that absent contrary evidence, equal access to both parents was a worthwhile
ideal, but in reality, our society was far from a situation where fathers take
on 50 percent of the responsibility of child-rearing.  Dr. Natalicio disagreed with Dr. Gold=s opinion on the quantity versus
quality of time issue with respect to contact between a child and non-custodial
parent.  According to Dr. Natalicio, the
literature clearly shows that quality is what counts in the 

non-custodial parent-child
relationship, not the frequency of contact. 
Frequency of contact, in itself, does not promote secure attachment
between the child and his father. 
However, the quality of a father=s
interaction with the child is an extremely strong predictor of the child-father
security attachment.  Dr. Natalicio
agreed that accessibility needs to be on a regular basis, which is the function
of a visitation plan.

Dr. Natalicio
agreed that interaction with extended family is desirable as long as they are
in fact positive role models and as long as the child is flowing into those
relationships from a secure base of attachment. 
He agreed that stability and continuity with such an extended family
would be in a child=s best
interest provided that the child was in the environmental familial situation in
which the parent to whom the child is attached is also present.  In Dr. Natalicio=s
opinion, it is not a question of where the child goes, rather it is whether the
child is with the parent to whom the child is securely attached.








From the
literature, Dr. Natalicio believed that when attachment is disturbed, there can
be adjustment difficulties for children. 
Children are resilient, but disruptions in the secure attachment pose
one of the greatest threats to their normal development.  Dr. Natalicio stated that research in child
development indicated that M.S.C. is coming into a rather critical period of
time when more discipline comes to bear on his behavior because a child is
learning to develop some self-control.  A
healthy transition through that development depends on the secure attachment
with the parent.  For instance,
consistency of the attachment allows for transition to take place without
imposing shame and creating doubt in the psychological makeup of the child
during toilet training.  Dr. Natalicio
therefore believed that in this way, M.S.C.=s
age and developmental stage factored into the relocation issue.  Since M.S.C. and his father are attached and
there is a visitation plan, Dr. Natalicio believed that the quality of their
relationship could continue and lead to good adjustment for the child.

Following the
hearings, the trial court entered a final order in which it determined that
Mrs. Dingbaum had the exclusive right to establish the primary residence of the
child without regard to geographical restriction subject to certain conditions
and restrictions set forth below.  The
order provides:

Geographic Area
for Primary Residence 

SONIA DINGBAUM shall
have the right to establish the primary residence of the child without regard
to geographic restriction so long as she remains married to JAY DINGBAUM and is
living with JAY DINGBAUM.  If SONIA
DINGBAUM=s
marriage to JAY DINGBAUM ends by death or divorce, or if SONIA DINGBAUM no
longer lives in the locale of the base where JAY DINGBAUM is stationed, then
the primary residence of the child, [M.S.C.], shall revert to El Paso County,
Texas.  If any of the events should occur
which would result in a change in the primary residence of the child to El Paso
County, Texas SONIA DINGBAUM IS ORDERED to immediately and forthwith notify
GEORGE CISNEROS, in writing, of such occurrence and SONIA DINGBAUM shall,
within a reasonable length of time, not to exceed three months, return the
child to El Paso County, Texas to reside with her or to reside with GEORGE
CISNEROS, if SONIA DINGBAUM does not immediately return to El Paso, Texas to
take up residence.

 








In addition to the
above, IT IS FURTHER ORDERED that if SONIA DINGBAUM is not residing with JAY
DINGBAUM because JAY DINGBAUM has been deployed by the U.S. military to an
assignment which does not permit his family to accompany him or if SONIA
DINGBAUM opts not to accompany her husband for any reason, and if the
deployment is of a duration of 12 or more consecutive months, then SONIA
DINGBAUM shall, within a reasonable amount of time, not to exceed three months,
return the child to El Paso County, Texas to live with her or with GEORGE
CISNEROS, if SONIA DINGBAUM does not return to El Paso County to reside.  In this regard, if at the time of the
deployment, or any time thereafter, JAY DINGBAUM knows or has reason to know
that the deployment will be of a duration of 12 or more consecutive months, the
obligation of SONIA DINGBAUM to return the child to El Paso County shall be
triggered at that time and not at the expiration of the 12 month period.

 

IT IS FURTHER ORDERED
that at such time as JAY DINGBAUM returns from this deployment, SONIA DINGBAUM
shall have the option to reunite with JAY DINGBAUM and reside with the child in
the locale of the base where JAY DINGBAUM is next stationed. 

 

IT IS FURTHER ORDERED
that SONIA DINGBAUM shall provide written notice to GEORGE CISNEROS within 72
hours of learning of a deployment that will separate her from JAY
DINGBAUM.  This notice will include the
expected duration of the deployment, if that information is known to either
SONIA DINGBAUM or JAY DINGBAUM, and shall be accompanied by copies of any
written orders or notices from the United States military with respect [to] the
effective date of the deployment and, if applicable, the expected duration of
the deployment.

 

Upon request,
written findings of fact and conclusions of law were prepared and filed.  Pertinent to this appeal, the trial court
found:

$                  
that M.S.C. born July 20, 2000 is the child of
Mrs. Sonia Dingbaum and Mr. George Cisneros and that the parties acknowledged
that M.S.C. is bonded to each parent;

 

$                  
that after M.S.C. was born, Mrs. Dingbaum
married her husband, Captain Jay Dingbaum and on December 13, 2001, had a
child, V.D.;

 

$                  
that after M.S.C. was born, Mr. Cisneros married
his wife, Monica Cisneros and that at no time were Mr. Cisneros and Mrs.
Dingbaum living together;

 

$                  
that the parties and their respective families
unquestionably love M.S.C. and provide excellent care for him when he is in
their respective care;

 








$                  
that the parents=
abided by the court=s
visitation schedule during the pendency of this cause and that experts of each party
testified that it was important for M.S.C. to have quality contacts with his
father in order to continue further the bonding with his father;

 

$                  
that Captain Dingbaum was ordered transferred by
the United States Army to report to 
Colorado Springs, Colorado; that he has been in the Army since 1996, is
a nurse anesthetist; that he and his family were to leave El Paso, Texas on
October 22, 2002, in order for him to report for duty on time;

 

$                  
that Mrs. Dingbaum stated she would be leaving
El Paso, Texas, with her husband because she wanted to keep her family
together;  that she felt this was in
M.S.C.=s best
interest; that she stated she would do whatever she could to help M.S.C. bond
with his father and she agreed to additional visitation for Mr. Cisneros and
his son; that Captain Dingbaum stated that he would assist Mr. Cisneros in
arranging for live Avideo
conferencing@ of
M.S.C. with his father in order to promote their relationship as well, even on
a nightly basis;

 

$                  
that Mr. Cisneros acknowledged that he did not
desire to separate M.S.C. from his mother nor from his brother, V.D.

 

In its conclusions of law,
the court determined: 

 

$                  
that it reviews
and considers this cause as a Suit Affecting the Parent-Child Relationship
governed by the Texas Family Code;

 

$                  
that since the
court was not asked to rule on the issues of conservatorship, the court finds
that it is in the best interest of the child that the parties continue as joint
managing conservators of the child, with Mrs. Dingbaum, designated as primary
care-giver having the right to determine the residence of the child subject to
the court=s restrictions; 


 

$                  
that the court finds
it is in the best interest of the child that Mrs. Dingbaum, may determine the
child=s primary
residence without regard to geographic location subject to the court=s restrictions; that the court based
this decision on the conduct of the parties, the order of the United States
Army received by Captain Dingbaum, the statement by Mrs. Dingbaum that she
would continue to do whatever she could to help M.S.C. bond with his father,
Mr. Cisneros, and the offer of Captain Dingbaum to arrange Avideo conferencing@ between Mr. Cisneros and his son;

 








$                  
that the court finds it is in the best interest
of the child that since the child is not being restricted to El Paso, Texas,
that a non-standard possession and access order should be entered; that the
court finds that a non-standard visitation order is an appropriate mechanism to
maintain and strengthen the bond between Mr. Cisneros and his son as well as
grant periods of possession of the child at least as similar as possible to
those provided by the standard possession order; that the court further finds
that a non-standard visitation order is an appropriate mechanism to lessen the
effects of travel on the child; in arriving at this decision the court has
taken into account: the age of the child, the circumstances of the parties, the
needs of the parties, and the best interest of the child;

 

$                  
that the court finds it is in the best interest
of the child that Mr. Cisneros will have phone contact with his son at
particular dates and times in order to maintain and build his bond with his
son;

 

$                  
that the court finds that it is in the best
interest of the child that Mr. Cisneros will have more visitation time with his
son than called for by the Standard Possession Order in order to help maintain
and build his bond with his son; that the court finds that it is in the best
interest of the child that Mr. Cisneros will have a longer summer vacation than
normal in order to help maintain and build his bond with his son;

 

$                  
that the court finds that it is in the best
interest of the child that when Mrs. Dingbaum travels to El Paso, Texas, Mr.
Cisneros with limited exceptions will be entitled to additional possession
times with his son during specified periods of time and days.

 

DOMICILE
RESTRICTION

In his sole issue,
Mr. Cisneros contends the trial court erred in not restricting M.S.C.=s residence to El Paso County, Texas
and that it refused to impose a domicile restriction based on evidence that
M.S.C.=s
stepfather desired to hold employment outside El Paso County.  Mr. Cisneros asserts that the trial
court did not properly apply the mandated state policy of assuring frequent and
continuing contact and did not properly evaluate M.S.C.=s
best interest.

Standard
of Review








A trial court=s order regarding conservatorship is
reviewed under an abuse of discretion standard. 
See Gillespie v. Gillespie, 644 S.W.2d 449, 451 (Tex. 1982).  A trial court abuses its discretion if it
acts arbitrarily and unreasonably or without reference to any guiding
principles.  Downer v. Aquamarine
Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985), cert. denied,
476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986).  The trial court is in the best position to
observe the demeanor and personalities of the witnesses and can Afeel@
the forces, powers, and influences that cannot be discerned by merely reading
the record.  Bates v. Tesar, 81
S.W.3d 411, 424 (Tex.App.--El Paso 2002, no pet.); Jenkins v. Jenkins,
16 S.W.3d 473, 477 (Tex.App.--El Paso 2000, no pet.).  Thus, an abuse of discretion does not occur
if some evidence of a substantive and probative character exists to support the
trial court=s
decision.  Bates, 81 S.W.3d at
424-25; Jenkins, 16 S.W.3d at 477.

Once it has been
determined that the abuse of discretion standard applies, an appellate court
should engage in a two-pronged inquiry: 
(1) Did the trial court have sufficient information upon which to
exercise its discretion; and (2) did the trial court err in its application of
discretion?  Franco v. Franco, 81
S.W.3d 319, 333 (Tex.App.--El Paso 2002, no pet.); Lindsey v. Lindsey,
965 S.W.2d 589, 592 (Tex.App.--El Paso 1998, no pet.).

Burden
of Proof 

On appeal, Mr.
Cisneros argues that the burden of proof in the context of relocation
litigation in an original proceeding should be on the party seeking to
relocate.  He asserts that unlike a
modification suit, when a domicile restriction is litigated in the first instance,
neither party has the burden to prove a change in circumstances.  See Bates, 81 S.W.3d at 424 (burden of
proof on moving party in modification suit given absence of legislatively
imposed statutory presumptions in relocation cases).  Mr. Cisneros contends that in these cases,
the burden should be on the party whose action or desired action contravenes or
compromises the state=s
public policy in favor of children=s
frequent and continuing contact with parents. 
We agree that the burden of proof enunciated in Bates does not
apply to this case, but differ in our reasoning. 








The best interest
of the child is always the primary consideration of the court in determining
issues of conservatorship, possession of and access to a child.  See Tex.Fam.Code
Ann. ' 153.002
(Vernon 2002).  In Texas, it is presumed
to be in a child=s best
interest for his parents to be appointed joint managing conservators.  See Tex.Fam.Code
Ann. '
153.131(b).  It is the public policy of
this state to assure that children have frequent and continuing contact with
parents who have shown the ability to act in the best interest of the child,
and to encourage parents to share in the rights and duties of raising their
children after the parents have separated or dissolved their marriage.  See Tex.Fam.Code
Ann. '
153.001(a).

In this case, the
parents= status
as joint managing conservators is not at issue. 
Both parties sought affirmative relief from the trial court with regard
to its determination of M.S.C.=s
best interest on issues related to their conservatorship.  In order for the trial court to conduct an
appropriate best-interest analysis in this case, the parties both needed to
present evidence in support of their position on the child=s best interest.  In this regard, both parties carry the burden
of introducing sufficient evidence for the trial court to make its decision on
the best interest of the child.  See,
e.g., Lide v. Lide, 116 S.W.3d 147, 152 (Tex.App.--El Paso 2003, no
pet.)(once burden of producing evidence to rebut joint managing conservatorship
presumption is discharged, evidence is then evaluated as it would be in any
other case, and the presumption has no effect on the burden of
persuasion).  Therefore, we disagree that
our state=s public
policy in favor of frequent and continuing contact necessarily places a burden
on Mrs. Dingbaum to prove that there should not be a domicile restriction.  Rather, the best interest of the child
remains the primary consideration of the court in determining issues of
conservatorship, possession, and access to a child, including any relocation
issues litigated in an original proceeding. 
We observe that there is nothing in the record to indicate the trial
court erroneously placed a higher burden on one party over the other in determining
the relocation issue.








Best
Interest of the Child Analysis

Mr. Cisneros= primary contention on appeal is that
the trial court based its decision solely on Captain Dingbaum=s desire to continue his employment in
the Army and not on the child=s
best interest as required under the Texas Family Code.  He claims that the only reason the trial
court allowed M.S.C. to relocate outside of El Paso was his stepfather=s pursuit of his military career.  Mr. Cisneros argues that in this case, the
stepparent=s desires
were permitted to override a joint managing conservator=s
right to frequent and continuing contact with his child and the child=s right to frequent and meaningful
contact with both parents.  

The Texas Family
Code provides that:

(b)        In rendering an order appointing joint
managing conservators, the court shall:

 

(1)        designate the conservator who has the
exclusive right to determine the primary residence of the child and;

 

                                                              .               .               .

 

(B)       specify that the conservator may
determine the child=s primary
residence without regard to geographic location.

 

Tex.Fam.Code
Ann. '
153.134(b)(1)(B)(Vernon Supp. 2004-05).

The statute is
silent as to the specific factors that the trial court should consider when
determining whether a domicile restriction is in the best interest of the
child.  The Texas Supreme Court in Lenz
v. Lenz provided courts some guidance in applying our state=s 








best-interest standard in the
relocation context.  See Lenz v. Lenz,
79 S.W.3d 10, 13-16 (Tex. 2002).  The Lenz
Court highlighted various relevant factors considered in other jurisdictions which
may assist Texas courts in determining a child=s
best interest in relocation cases, including: the reasons for and against the
move; the effect on extended family relationships; the effect on visitation and
communication with the non-custodial parent to maintain a full and continuous
relationship with the child; the possibility of a visitation schedule allowing
the continuation of a meaningful relationship between the non-custodial parent
and child; the nature of the child=s
existing contact with both parents, and the child=s
age, community ties, and health and educational needs.  See Lenz, 79 S.W.3d at 15-17; see
also Bates, 81 S.W.3d at 434 (listing additional factors courts of other
jurisdictions have considered in the specific context of relocation
litigation).  However, the Lenz
Court clearly stated that suits affecting the parent-child relationship, such
as this case, are intensely fact-driven and consequently involve balancing
numerous factors in the court=s
particular best-interest analysis.  Lenz,
79 S.W.3d at 18-19; see also Franco, 81 S.W.3d at 340 (evidentiary
review in relocation cases is inherently fact specific). 








Here, the trial
court specifically found that Mrs. Dingbaum would be leaving El Paso, Texas
with her husband because she wanted to keep her family together and that she
felt that this was in M.S.C.=s
best interest.  Evidence from the
hearings shows no bad-faith or ill motive on the part of Mrs. Dingbaum for
desiring to leave the El Paso area. 
Rather, Mrs. Dingbaum testified that relocation would be hard for her
given her good relationships with extended family in El Paso.  The trial court found that the parties and
their respective families provide love and excellent care to him and that
M.S.C. is bonded to each parent.  Based
on testimony from Mrs. Dingbaum and Captain Dingbaum, the trial court
found that Mrs. Dingbaum would do whatever she could do to help M.S.C. bond
with his father, including agreeing to additional visitation, and that Captain
Dingbaum would assist Mr. Cisneros in arranging for live video conferencing in
order to promote their relationship. 
Evidence at the hearings supports these findings.

The court also
concluded that it was in the best interest of M.S.C. to allow Mr. Cisneros more
visitation than called for by the standard possession order.  Since the child was not being restricted to
El Paso, the court concluded that a non-standard possession order be entered
based on its findings that such an order was an appropriate mechanism to
maintain and strengthen the parent-child bond, and to grant periods of
possession as similar as possible to those provided by the standard possession
order.  Evidence regarding the quality
and nature of Mr. Cisneros=
relationship with his son, M.S.C.=s
age and developmental needs, and expert testimony on the need for quality
interaction clearly supports the trial court=s
conclusion.

On appeal, Mr.
Cisneros specifically takes issue with the particular wording of the trial
court=s limited
restriction on Mrs. Dingbaum=s
right to establish the primary residence of M.S.C.  According to Mr. Cisneros, the trial court
restricted the child=s
domicile to El Paso only if Captain Dingbaum is not in the military, if Mrs.
Dingbaum is not living with him, or if Captain Dingbaum=s
deployment requires him to be away from his family for twelve months or
more.  Mr. Cisneros notes that the
variety of scenarios addressed in the limited domicile restriction are all
based on Captain Dingbaum and his assignment with the U.S. Army.








However, after
reading the court=s order
on the geographic area for primary residence in context, we find that Mr.
Cisneros=
interpretation unduly shifts the focus away from the party whom the court
sought to place the restrictions and conditions upon--that is, Mrs.
Dingbaum.  In the court=s findings, it specifically found that
it was in the best interest of M.S.C. that Mrs. Dingbaum be designated as
primary care-giver having the right to determine the residence of the child
subject to the court=s
restrictions.  There is evidence in the
record to support this finding.  The
order provides that Mrs. Dingbaum has the right to establish the primary
residence of the child without regard to geographic restriction unless certain
events occur in her relationship with Captain Dingbaum that would trigger the
stated restrictions.  Under the various
Dingbaum family separation scenarios, Mrs. Dingbaum still remains the
designated primary care-giver when the child=s
primary residence reverts to El Paso County. 
The order only requires the child to reside with Mr. Cisneros if Mrs.
Dingbaum fails to return to El Paso to take up residence within the time period
specified in the order.

In fashioning its
order, it is clear that the trial court balanced numerous best-interest factors
including the nature of the new Dingbaum family unit, the rich and nurturing
extended family relationships in El Paso, and Mr. Cisneros= undisputed testimony that he did not
desire to separate M.S.C. from his mother or his baby brother.  We conclude that the trial court had
sufficient information upon which to exercise its discretion.  Further, we conclude the trial court made a
reasonable decision based on the evidence presented, it did not act in
contravention to the state=s
public policy of assuring frequent and continuing contact, nor did it otherwise
err in its application of its discretion in this case.  We overrule Mr. Cisneros= sole issue and affirm the trial court=s final order. 

 

 

March
17, 2005

DAVID WELLINGTON
CHEW, Justice

 

Before Panel No. 2

Barajas, C.J., McClure, and Chew, JJ.











[1]
Mr. Cisneros=
possession schedule under the temporary orders was:  every Sunday beginning at 2 p.m. and ending
at 12 noon on the following Monday; every Tuesday beginning at 2 p.m. and
ending at 6 p.m.; and every Wednesday beginning at 12 noon and ending at 10
a.m. the following Thursday.





[2]
Captain Dingbaum=s
assignment preference form was admitted into evidence at one of the
hearings.  In the form, Captain Dingbaum
noted that because his wife shares custody with the child=s father and the child is very young,
it would beneficial for them to be assigned to the El Paso area for as
long as possible.





[3]
In September 2002, while this suit was pending before the trial court, Captain
Dingbaum received orders from the military transferring him to Colorado
Springs, Colorado.  Following a
relocation hearing to establish a temporary possession schedule, the Dingbaums
moved to Colorado in October 2002.