COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



|  |  |  |
|---|---|---|
| | § | |
| IN THE INTEREST OF M.V., A MINOR. | § | No. 08-17-00191-CV |
| | § | Appeal from |
| | § | 383rd District Court |
| | § | of El Paso County, Texas |
| | § | (TC # 2012DCM05770) |
| | § | |

## **O P I N I O N**

Erica Manso and Erick Vargas, who were never married, are the parents of M.V.  On November 5, 2012, the trial court entered an Order Establishing the Parent-Child Relationship (the original order), designating both parents as joint managing conservators of M.V., but naming Manso as the primary managing conservator with the right to designate M.V.'s primary residence. The original order contained a geographic residency restriction that limited Manso's right to designate M.V.'s residence to El Paso County and any counties contiguous to El Paso County. On February 21, 2017, Manso filed a motion to modify the parent-child relationship, seeking to lift the geographic residency restriction, arguing that a material and substantial change of circumstances had occurred that warranted lifting the restriction, and that doing so would be in M.V.'s best interest.   Vargas opposed the motion.

Following a hearing on July 10, 2017, the trial court granted the motion and issued an Order

on Modification, lifting the geographic residency restriction and giving Manso the exclusive right to designate M.V.'s primary residence. Vargas appeals, contending that the trial court abused its discretion in granting the modification. For the reasons set forth below, we affirm the trial court's judgment.[1]

## BACKGROUND

At the hearing on her motion to modify, Manso explained that she sought to lift the geographic residency restriction because she had recently married Isaiah Salazar, and she wished to relocate to San Antonio where Salazar resided, along with M.V., who was five years old at the time, to live with her new husband as a family unit.[2] Manso testified that she met Salazar at a church camp approximately six years before the hearing, and that during that time the two of them had dated on and off and had traveled to see each other once or twice a month for the past year.

At the time of the hearing, Manso lived in an apartment in El Paso with her parents and two older siblings, and shared a bedroom, as well as a bed, with M.V. Because she did not have a car, Manso had to take a bus to her part-time job at a UPS store, and M.V. had to ride the bus to his Head Start program. In addition, due to her lack of transportation, Manso was only able to attend one parent-teacher conference at M.V.'s school that year.

Manso testified that Salazar lived with his parents and sister in San Antonio, and that upon moving to San Antonio, she and M.V. would share Salazar's bedroom, but that M.V. would have his own bed in the room. Manso also testified that Salazar had been employed at a lumber mill in San Antonio for the past three or four years, and that he owned a car she would be able to use

---

[1] This case was submitted on Vargas's brief only since Manso did not file a brief.

[2] Manso testified that she and Vargas were never married.

2

once she moved there. Although Manso acknowledged that she had not lined up a job in San Antonio at the time of the hearing, she testified that there were UPS stores in San Antonio that were similar to the one where she worked in El Paso.

Vargas testified that he also lived with his parents and his younger brother in El Paso, and that he and his family had a close relationship with M.V. Vargas testified that he often took M.V. hiking, and was interested in enrolling M.V. in extracurricular activities in El Paso. ). Vargas further testified that he was very involved with M.V.'s school and had attended two parent-teacher conferences during the prior school year. M.V.'s teacher testified at the hearing, confirming that Vargas had been involved in his son's education, had attended two parent-teacher conferences, and had stopped by the school at least every other week to inquire about M.V.'s progress. She acknowledged, however, that Manso had also been involved in her son's schooling throughout the year, and that Manso had attended one of the two parent-teacher conferences she had held that year. She testified that M.V. was a well-behaved and attentive student, and described him as being a "happy" and "positive" child.

At the hearing, Vargas acknowledged that he and Manso had been having ongoing conflicts for over a year with respect to their agreed-upon visitation schedule, in part because Vargas had started a new job that required him to work a rotating schedule, which interfered with his ability to adhere to the schedule. Although Vargas had the right to visit M.V. on Thursdays and alternate weekends, Manso testified that Vargas never picked up M.V. on Thursdays, and that Vargas called her two or three times a month to try to reschedule his weekend visitation. Vargas, however, claimed that he and Manso had a "verbal agreement," in which she had consented to accommodate his new work schedule, and he therefore had not pursued any legal proceedings to address the issue

3

until after Manso filed her motion to modify when he filed a counterpetition to modify the parties' visitation schedule.[3]

At the close of the hearing, the trial court granted Manso's motion to modify, and thereafter issued an "Order on Modification," on August 22, 2017, finding that it was in the "best interest" of the child to lift the geographic residency restriction. The Order on Modification again named the parties as joint managing conservators, and again designated Manso as the primary conservator with the exclusive right to designate M.V.'s primary residence. It also included standard possession orders for parents living more than 100 miles apart.[4] *See* TEX.FAM.CODE ANN. § 153.313 (setting forth standard visitation schedules for possessory conservators who live more than 100 miles from the residence of the child). Although Vargas filed a timely request for the trial court to enter findings of fact and conclusions of law, the trial court did not grant the request.[5]

After the trial denied Vargas's motion for a new trial, this appeal followed.

**DISCUSSION**

---

[3] Although the record reflects that Vargas filed a "counterpetition" seeking to modify the parties' visitation schedule on July 5, 2017, he did not set the counterpetition for hearing and the trial court expressly stated that it was not considering Vargas's counterpetition at the hearing. Further, it does not appear that Vargas ever pursued a ruling on his request to modify.

[4] The Order on Modification gave Vargas the right to possession of M.V. on alternate weekends during the school year, spring vacations each year, every Father's day, two hours on M.V.'s birthday, Christmas holidays in even-numbered years and Thanksgiving holidays in odd-numbered years, as well as 42 days in the summer.

[5] Vargas filed his "Request for Findings of Fact and Conclusions of Law" on August 23, 2017, and then filed a "Notice of Past-Due Findings of Fact and Conclusions of Law" on September 25, 2017. Although Vargas is not complaining on appeal about the trial court's failure to enter findings of fact and conclusions of law, we note that Rule 297 of the Texas Rules of Civil Procedure requires a party to file his past-due notice within 30 days after his initial request was made. *See* Tex.R.Civ.P. 297 (if a trial court fails to file findings of fact and conclusions of law as requested by a party, the party making the request must, within thirty days after filing the original request, file a "Notice of Past Due Findings of Fact and Conclusions of Law."). Vargas was required to file his past-due notice on or before September 22, 2017, and by failing to do so, he waived his right to raise this issue on appeal. *See Holmes v. GMAC, Inc.*, 458 S.W.3d 85, 97 (Tex.App.--El Paso 2014, no pet.)(recognizing that when a party does not timely file a past-due notice as required by Rule 297, he waives any appellate complaint regarding the trial court's failure to enter written findings of fact and conclusions of law).

4

In a single issue, Vargas argues that the trial court abused its discretion in granting Manos' motion for modification, asserting that there was insufficient evidence to support the trial court's finding that it was in M.V.'s best interest to lift the geographic residency restriction in the original order. For the reasons set forth below, we disagree.

*Applicable Law*

The Texas Family Code provides that a trial court may modify a conservatorship order if the movant proves by a preponderance of the evidence that: (1) the modification would be in the best interest of the child; and (2) the circumstances of the child, a conservator, or other person affected by the order have materially and substantially changed since the date of the rendition of the prior order. *In re T.M.P.*, 417 S.W.3d 557, 562 (Tex.App.--El Paso 2013, no pet.), *citing* TEX.FAM.CODE ANN. § 156.101. Although the Code does not list any specific factors to be considered when determining whether it is in a child's best interest to modify a geographic residency restriction, the Texas Supreme Court has noted that this determination should generally be guided by the public policy considerations set forth in section 153.001 of the Code for all suits affecting the parent-child relationship, which are to: "(1) assure that children will have frequent and continuing contact with parents who have shown an ability to act in the best interest of the child; (2) provide a safe, stable, and nonviolent environment for the child; and (3) encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage." *Lenz v. Lenz*, 79 S.W.3d 10, 14 (Tex. 2002), *citing* TEX.FAM.CODE ANN. § 153.001.

In *Lenz,* the Court further noted that in the past courts have generally disfavored lifting geographic residency restrictions to allow a parent to take a child out of the jurisdiction issuing the

5

original order.  *Id.* at 14.  However, the Court recognized that in light of the "[i]ncreasing geographic mobility and the availability of easier, faster, and cheaper communication," the standards for relocation have been reevaluated over the years, and courts have generally been "moving away from a relatively strict presumption against relocation and toward a more fluid balancing test that permits the trial court to take into account a greater number of relevant factors." *Id.* at 14-15. Because determining whether it is in a child's best interest to lift a geographic residency restriction is "intensely fact driven," the court held that "no bright-line test can be formulated," and that instead, courts should consider and balance numerous factors in making such a determination.  *Id.* at 15-16, 19.

The *Lenz* opinion identified several factors that a court should consider when determining whether it is in a child's best interest to lift a geographic restriction to accommodate a parent's desire to relocate with the child, including the following:   (1) the parent's good-faith reasons for the proposed move; (2) the effect the move would have on the economic, educational, health, and leisure opportunities for the custodial parent and the child; (3) the positive impact the move would have on the custodial parent's emotional and mental state, with beneficial results to the child; (4) whether the move would improve the custodial parent's financial situation and ability to provide a better standard of living for the child; (5) whether the child's special needs or talents could be accommodated at the new location; (6) the child's relationship with and presence of extended family and friends, and the effect the move would have on those relationships; (7) the effect the move would have on the noncustodial parent's visitation and communication with the child, and his ability to maintain a full and continuous relationship with the child; (8) whether the noncustodial parent has the ability to relocate; and (9) whether a visitation schedule could be

arranged that would allow the noncustodial parent to continue a meaningful relationship with the child following the move. *In re T.M.P.*, 417 S.W.3d at 565, *citing Lenz,* 79 S.W.3d at 15-18; *see also Mitchell v. Wright*, 03-16-00496-CV, 2017 WL 2927063, at *1-5 (Tex.App.--Austin July 7, 2017, no pet.)(not designated for publication); *In re K.L.W.*, 301 S.W.3d 423, 425-26 (Tex.App.--Dallas 2009, no pet.). Other factors a court may consider include the need to provide stability in a child's life, and the need to prevent constant litigation in child custody cases. *In re T.M.P.*, 417 S.W.3d at 565, *citing In re V.L.K.,* 24 S.W.3d 338, 343 (Tex. 2000).

### *Standard of Review*

We review a trial court's decision to modify a conservatorship order for a clear abuse of discretion. *In re T.M.P.*, 417 S.W.3d at 562, *citing Gillespie v. Gillespie,* 644 S.W.2d 449, 451 (Tex. 1982); *see also Bates v. Tesar*, 81 S.W.3d 411, 424-25 (Tex.App.--El Paso 2002, no pet.); *Jenkins v. Jenkins,* 16 S.W.3d 473, 477 (Tex.App.--El Paso 2000, no pet.). A trial court abuses its discretion when it acts arbitrarily or unreasonably, without reference to any guiding principles, or when it fails to correctly analyze the law. *In re T.M.P.* at 562, *citing Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 242 (Tex. 1985).

To determine whether the trial court abused its discretion, we engage in a two-pronged inquiry, asking: (1) whether the trial court had sufficient information upon which to exercise its discretion; and (2) whether the trial court erred in its application of discretion. *Id.* at 562-563; *see also In Interest of C.M.V.*, 479 S.W.3d 352, 358 (Tex.App.--El Paso 2015, no pet.); *Bates,* 81 S.W.3d at 425, *citing Lindsey v. Lindsey,* 965 S.W.2d 589, 592 (Tex.App.--El Paso 1998, no pet.). Where, as here, the trial court has not filed findings of fact and conclusions of law, we imply all necessary findings of fact to support the trial court's order. *In re T.M.P.*, 417 S.W.3d at 563,

7

*citing BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex. 2002). When the appellate record includes a reporter's record, the trial court's implied findings may be challenged for legal and factual sufficiency. *Id.*, *citing In re W.C.B.,* 337 S.W.3d 510, 513 (Tex.App.--Dallas, 2011, no pet.); *Zeifman v. Michels,* 212 S.W.3d 582, 588 (Tex.App.--Austin 2006, pet. denied). In this context, challenges to the legal and factual sufficiency of the evidence are not independent grounds of error but are instead relevant factors in assessing whether the trial court abused its discretion. *In Interest of C.M.V.*, 479 S.W.3d at 358, *citing In re T.M.P.,* 417 S.W.3d at 562.

In determining whether there is legally sufficient evidence, we consider the evidence in the light most favorable to the finding if a reasonable fact finder could, and disregard evidence contrary to the finding unless a reasonable fact finder could not. *In re T.M.P.*, 417 S.W.3d at 562, *citing City of Keller v. Wilson,* 168 S.W.3d 802, 807 (Tex. 2005). When reviewing the factual sufficiency of the evidence, we consider and weigh all the evidence, and will set aside a finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Id.*, *citing City of Keller,* 168 S.W.3d at 822. When the evidence is conflicting, we must presume that the fact finder resolved the inconsistency in favor of the order if a reasonable person could do so. *Id.* The trial court does not abuse its discretion if evidence of a substantive and probative character exists to support its decision. *Id.; see also Bates*, 81 S.W.3d at 424-25, *citing Jenkins,* 16 S.W.3d at 477; *In re B.A.W.*, 311 S.W.3d 544, 550 (Tex.App.--El Paso 2009, no pet.).

Because the trial court is in the best position to observe the witnesses and their demeanor, we give the court great latitude when determining the best interest of a child. *In re T.M.P.*, 417 S.W.3d at 562-63. Accordingly, the mere fact that we might decide the issue differently than the trial court does not establish an abuse of discretion. *Id.* at 563; *see also Bates*, 81 S.W.3d at 425.

8

In other words, the "test for an abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action, but whether the court acted without reference to any guiding rules and principles." *In re B.A.W.*, 311 S.W.3d at 550, *citing Hodson v. Keiser*, 81 S.W. 3d 363, 368 (Tex.App.--El Paso 2002, no pet.).

*Analysis*

**Material and Substantial Changes in Circumstances Occurred**

In a modification suit, the threshold inquiry is whether the moving party has met the burden of demonstrating that a material and substantial change has occurred after the prior conservatorship order was entered. *In re T.M.P.*, 417 S.W.3d at 564, *citing Bates,* 81 S.W.3d at 427. In determining whether such a change has occurred, the trial court should compare the evidence of the conditions that existed at the time of the entry of the prior order with the evidence of the conditions that existed at the time of the hearing on the motion to modify.[6] *Id.* at 563-64, *citing In re W.C.B.,* 337 S.W.3d at 514; *see also Zeifman*, 212 S.W.3d at 587.

It is well-established that when the evidence demonstrates that one or both of the parties has married or become engaged to another individual after the entry of the prior order, a court may consider this to be a material and substantial change justifying a modification. *In re T.M.P.*, 417 S.W.3d at 564, *citing In re A.L.E.*, 279 S.W.3d 424, 429 (Tex.App.--Houston [14th Dist.] 2009, no pet.); *Zeifmans*, 212 S.W.3d at 593 ("Evidence of a parent's subsequent marriage to another can constitute a relevant, material change of circumstances after rendition of the decree sought to be

---

[6] Vargas finds it significant that the original order was not introduced into evidence in the lower court proceedings, which he apparently believes will hinder our ability to make this comparison. However, we note that there was no dispute in the trial court regarding the nature of the geographic restriction in the original order, nor does Vargas dispute the terms of the original order on appeal. Moreover, there is sufficient evidence in the record from which we may determine whether or not a change of circumstances occurred between the time the original order was entered and the time it was modified, without the need to review the original order.

modified."); *In re S.N.Z.*, 421 S.W.3d 899, 909 (Tex.App.--Dallas 2014, pet. denied)(material change may include remarriage by a party); *In re S.R.O.*, 143 S.W.3d 237, 247 (Tex.App.--Waco 2004, no pet.)(recognizing that remarriage can constitute a material change of the circumstances). This is particularly true when the newly-married or engaged parent has already relocated, or intends to relocate, a significant distance away as the result of the marriage or engagement. *See, e.g.*, *Mitchell v. Wright*, No. 03-16-00496-CV, 2017 WL 2927063, at *3 (Tex.App.--Austin July 7, 2017, no pet.)(not designated for publication)(mother's engagement to fiancée and her plan to relocate to another state to live with her fiancée constituted a substantial and material change in circumstances); *Fuentes v. Jasso*, No. 08-03-00109-CV, 2004 WL 1078498, at *2 (Tex.App.--El Paso May 13, 2004, no pet.)(material change of circumstances existed where father, who had the exclusive right to designate the child's primary residence, had remarried and relocated from El Paso to Arizona, making the parties' current custody order "unworkable" and "ripe for modification."); *see generally Bates,* 81 S.W.3d at 430 (recognizing that when a parent relocates a "significant distance" away, a finding of changed circumstances may be appropriate).

As set forth above, the record indicates that when the parties' original order was entered in 2012, Manos was not married and was living in El Paso with M.V. and her extended family. The undisputed evidence at the hearing demonstrated that approximately five years after the original order was entered, Manos had married her new husband, and was making plans to relocate to live with him in San Antonio, a distance of almost 500 miles away.[7] Given the significant distance of

---

[7] Although the parties did not present evidence of the distance between these two cities, we note that this geographical fact is not subject to dispute, and we therefore take judicial notice of it. *See generally Barton v. State*, 948 S.W.2d 364, 365 (Tex.App.--Fort Worth 1997, no pet.)(recognizing that an appellate court "may take judicial notice of the location of counties because geographical facts are easily ascertainable and capable of verifiable certainty"); *see also Eagle Trucking Co. v. Texas Bitulithic Co.,* 612 S.W.2d 503, 506 (Tex. 1981)(op. on reh'g).

this move, together with her recent marriage to another individual, we conclude that Manos satisfied her burden of demonstrating that a material and substantial change in circumstances had occurred after the time the original order was entered, thereby making appropriate for the trial court to consider her modification request.

### Best Interest Analysis

The fact that a substantial and material change in the parties' circumstances has occurred, however, does not end our inquiry, and we must next determine whether there was sufficient evidence to support the trial court's determination that it was in M.V.'s best interest to grant Manos's motion for modification and to lift the geographic residency restriction set forth in the original order. Vargas argues that the evidence was not sufficient to support this determination, and that to the contrary, he presented clear evidence establishing that it would instead be in M.V.'s best interest for him to remain in El Paso. In particular, Vargas points out that the hearing record contains undisputed evidence that M.V. was thriving in El Paso, that he had a loving father in El Paso who was involved and interested in his son's education and extracurricular activities, and that M.V. had a close relationship with the extended families of both parents in El Paso. Vargas contends that Manso presented no evidence that would warrant uprooting M.V. from his home in El Paso and disrupting these relationships. Vargas argues that therefore, no reasonable trier-of-fact could have concluded that it was in M.V.'s best interest to lift the geographic residency restrictions restriction to allow Manso to relocate with their son to San Antonio.

Vargas is correct in pointing out that the record demonstrates that M.V. was a well-adjusted and happy young child, with significant family ties in El Paso that would likely be affected by the move. However, the effect that a move would have on a child's relationship with his extended

11

family is but one of the many factors in the *Lenz* opinion that we must consider in determining whether the record contains sufficient evidence from which the trial court could have concluded that it was in M.V.'s best interest to lift the geographical residency restriction.

In applying the *Lenz* factors, we first note that Vargas does not dispute that Manso's marriage and her desire to relocate to San Antonio to live with her new husband constituted a good-faith reason for her proposed move. Moreover, although Vargas is correct that M.V. did not expressly testify that she would be "happier" if she were permitted to move to San Antonio, () the trial court could have inferred that allowing Manos to move with her son to San Antonio to start her newly-married life with her husband would have a positive impact on Manso's emotional state, with resulting benefits to M.V. *See Echols v. Olivarez*, 85 S.W.3d 475, 481 (Tex.App.--Austin 2002, no pet.)(recognizing that the *Lenz* opinion made a custodial parent's happiness a factor in determining a child's best interest). And undoubtedly, the opposite would be true; if the trial court had refused to lift the geographical restriction, this most likely would have had a negative impact on Manos's emotional state, which in turn could have had an adverse effect on M.V.

In addition, contrary to Vargas's contention, there was evidence presented at the hearing to support an inference that Manso's economic and financial outlook would improve upon her move to San Antonio, and that this improvement would, in turn, elevate M.V.'s standard of living. As set forth above, Manso testified that there were UPS stores in San Antonio that were similar to the one where she worked in El Paso, and the trial court therefore could have inferred that Manos therefore had a satisfactory opportunity of finding a job upon her move to San Antonio. More importantly, Manso testified that she would be living with her husband, who was gainfully

12

employed in San Antonio, and although she did not know his salary, the court could have surmised that both Manso and M.V. would benefit economically from having a second wage-earner in his household. As well, the trial court could have concluded that Manso's employment opportunities would be better in San Antonio, given her lack of transportation in El Paso, and her ability to use her husband's car upon her move. Similarly, the trial court could have concluded that the opportunity to use her husband's car in San Antonio would enhance her ability to be involved in her son's education and extracurricular activities.

We also recognize that although M.V. will not be able to see his extended family in El Paso as often or as easily once he moves, this does not mean that M.V. will not have the presence of family in San Antonio. As set forth above, Manso testified at the hearing that she intended to move into a home shared by her new husband, his parents, and his sister, and therefore M.V. will have the presence of family, including a new stepfather, in the household. Although Vargas correctly points out that Manso did not present evidence regarding whether M.V. had already developed a relationship with his new stepfather and his family, the fact remains that M.V. will, at the least, have the opportunity to cultivate these new family relationships upon his move to San Antonio.

Moreover, while Vargas understandably expresses concern for the safety and well-being of his son upon his move to San Antonio, we note that there is nothing in the record to indicate that any danger awaits M.V. in his new home. Similarly, although Vargas complains that Manso failed to present any evidence regarding the types of educational and/or recreational opportunities that might be available to M.V. in San Antonio, there is nothing in the record to indicate that M.V. has any special needs or talents that could not be accommodated in San Antonio, or that San

13

Antonio has less educational or recreational opportunities than are offered in El Paso.

And finally, contrary to Vargas' argument, Manso did come forward at the hearing with a plan to help ensure that M.V. would be able to maintain a meaningful and continuing relationship with Vargas and his family in El Paso, testifying that she was willing to meet Vargas halfway between El Paso and San Antonio to exchange custody of M.V., and that she was also willing to share in the cost of transporting M.V. for his visitation with his father. Further, as set forth above, the trial court's Order on Modification once again named both parents as joint managing conservators, gave Vargas the right to participate in educational, medical and other decisions affecting his son, and further included standard visitation provisions that ensured Manso will have the opportunity to have possession of M.V. in accordance with the statutory guidelines for parents living more than 100 miles apart, giving him the right to possession of M.V. on alternate weekends, various holidays, Spring Vacations, and extended periods of time in the summer. While this arrangement may not be perfect, we note that the parties' prior visitation arrangement was also less than perfect, as the undisputed evidence demonstrated that Vargas had not been able to fully exercise his visitation rights even while M.V. was living in El Paso, particularly during the week, due to his work schedule. As such, if Vargas chooses to exercise his visitation as permitted by the Order on Modification, it appears that he will see M.V. almost as often as he has in the past, and therefore, the modification will likely only have a minimal impact on ability to maintain a continuing relationship with M.V. *See generally Mitchell,* 2017 WL 2927063, at *5 (father's inability to consistently exercise his rights to possession and access of the child prior to modification was a factor in determining whether it was in child's best interest to lift geographic restriction to allow mother to relocate to another state).

14

As in any custody case, there are often no perfect solutions when parties divorce or separate, and the trial court herein was tasked with making a difficult decision that will undoubtedly have an impact on M.V., his parents and his extended family. *See generally Fuentes,* 2004 WL 1078498, at *2-3 (recognizing the "painful reality" that when two devoted parents are divorced, it is inevitable that hard choices must be made with regard to custody decisions). However, our job, is not to second-guess the trial court's decision, or express how we might have ruled differently on Manso's motion; instead our job is to ensure that the trial court did not act unreasonably, arbitrarily, or without reference to guiding principles of family law in reaching its decision.

After reviewing the record and considering and balancing the relevant factors, we conclude that the trial court did not act unreasonably or arbitrarily in determining that it was in M.V.'s best interest to lift the geographic residency restriction in the original order, and that the trial court's determination was supported by both legally factually sufficient evidence.

Finding no abuse of discretion, we overrule Vargas's sole issue on appeal.

## CONCLUSION

The trial court's order is affirmed.

August 14, 2019

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.

15